In the Supreme Court of Georgia

Decided:   June 30, 2014

S13G1167. RODRIGUEZ v. THE STATE.

BLACKWELL, Justice.

In August 2010, a City of Norcross police officer stopped Sonia Rodriguez, and in the course of that traffic stop, the officer found more than four ounces of marijuana in her car. Rodriguez was indicted for possession of marijuana with intent to distribute, and she moved to suppress the discovery of the marijuana, conceding that it was reasonable for the officer to stop and detain her for a brief investigation, but contending that the marijuana was discovered only after her detention was unreasonably prolonged. Following an evidentiary hearing, the trial court denied her motion, but it certified its decision for immediate review, and the Court of Appeals allowed an interlocutory appeal.[1] The appeal eventually was heard by all twelve judges of the Court of Appeals, and although the Court of Appeals entered a judgment affirming the denial of

---

[1] See generally OCGA § 5-6-34 (b).

the motion to suppress, only six judges concurred in that judgment. See Rodriguez v. State, 321 Ga. App. 619 (746 SE2d 366) (2013).

Upon the petition of Rodriguez, we issued a writ of certiorari to review the decision of the Court of Appeals, and we directed the parties to address two questions in their briefs:

> 1. Was the Court of Appeals equally divided in this case, and therefore, should it have transferred the case to this Court? See Ga. Const. of 1983, Art. VI, Sec. V, Par. V.

> 2. If so, did the trial court err when it denied the motion to suppress?

We now conclude that the Court of Appeals never should have rendered any decision in this case and instead should have transferred the appeal to this Court. About the merits of the appeal, we see no error in the denial of the motion to suppress. Accordingly, we vacate the decision of the Court of Appeals, we affirm the judgment of the trial court, and we remand for the Court of Appeals to transmit a remittitur to the trial court consistent with this opinion.

1. We begin with the proceedings in the Court of Appeals, where the appeal was docketed in the September 2012 term. At first, the appeal was assigned to a panel of three judges, and on February 19, 2013, the panel issued

2

a unanimous decision, affirming the denial of the motion to suppress.[2] Eight days later, Rodriguez filed a motion for reconsideration. That motion was granted, the panel decision was vacated, and the case was referred to the full bench of twelve judges. See OCGA § 15-3-1 (c). On April 12, 2013, the Court of Appeals entered the decision of the full bench, again affirming the denial of the motion to suppress. That decision was announced in a per curiam opinion, which was joined in full by Presiding Judges Andrews and Barnes, in part and in judgment by Judges Boggs and Branch, and in judgment only by Judges Ray and McMillian. See Rodriguez, 321 Ga. App. at 623. Presiding Judge Doyle wrote a dissenting opinion, in which she proposed to reverse the denial of the motion to suppress, and her dissent was joined by then-Chief Judge Ellington, then-Presiding Judge Phipps, and Judge McFadden. See id. at 623-626 (Doyle, P.J., dissenting). Judge Dillard wrote his own dissenting opinion, in which he proposed to vacate the denial of the motion to suppress and remand for the trial court to reconsider the motion. See id. at 627 (Dillard, J., dissenting). Then-Presiding Judge Miller dissented separately, but without any opinion indicating

_____

[2] The original panel was composed of Presiding Judges Andrews and Doyle and Judge Boggs.

whether she would have reversed or only vacated the denial of the motion to suppress.[3]

Our Constitution provides that, "[i]n the event of an equal division of the Judges [of the Court of Appeals] when sitting as a body, the case shall be immediately transmitted to the Supreme Court." Ga. Const. of 1983, Art. VI, Sec. V, Par. V. We have addressed the meaning of the Equal Division clause before, and under our precedents, when the full bench of the Court of Appeals has considered every claim of error that might cause the judgment of the trial court to be set aside, and when the full bench is equally divided about whether

_____

[3] Other possible judgments, of course, are conceivable — that the appeal be dismissed for want of jurisdiction, for instance, or that the judgment of the trial court be affirmed in part and reversed in part — but none seem plausible in this case. About jurisdiction, there is no doubt that the Court of Appeals properly had jurisdiction of this interlocutory appeal, and no party urged that it was without jurisdiction. About a split judgment, there was only one question before the trial court — whether the discovery of the marijuana ought to be suppressed — and it would make no sense to affirm the judgment of the trial court in part and to reverse it in part. And in any event, if then-Presiding Judge Miller had proposed to affirm the judgment of the trial court in any respect, she would have concurred at least in part in the judgment announced in the per curiam opinion, but she did not. As such, we do not think then-Presiding Judge Miller meant to indicate by her dissent that she would favor any judgment other than those proposed by the two dissenting opinions, even if she did not join either of those opinions. Accordingly, we consider then-Presiding Judge Miller to have indicated by her unexplained dissent that she would either reverse or vacate the denial of the motion to suppress. Nevertheless, we note that such ambiguity in the judgment line of a decision complicates matters considerably.

4

that judgment must be set aside, there is an "equal division,"[4] and the case must be transferred to this Court. See Atlantic Coast Line R. Co. v. Godard, 211 Ga. 41, 42 (83 SE2d 591) (1954) (Equal Division clause "contemplates the transfer by the Court of Appeals to this court of cases where the Judges of the Court of Appeals are equally divided on all questions in the case which would require an affirmance or reversal of the judgment of the trial court"). See also Ford v. Uniroyal Goodrich Tire Co., 270 Ga. 730, 731, n.4 (514 SE2d 201) (1999) (noting that there was no equal division in Uniroyal Goodrich Tire Co. v. Ford, 218 Ga. App. 248 (461 SE2d 877) (1995), where a majority of judges were of the opinion that the judgment of the trial court must be reversed upon *some* ground, notwithstanding that the judges were equally split as to whether it had to be reversed on one particular ground); Atlantic Coast Line R. Co. v. Clinard, 211 Ga. 340, 342-343 (86 SE2d 1) (1955) (citing Godard and returning case to

---

[4] This understanding is consistent with the approach of the federal courts and many of our sister states. See, e.g., Ohio ex rel. Eaton v. Price, 364 U. S. 263, 264 (80 SCt 1463, 4 LE2d 1708) (1960) (court was equally divided where one justice did not participate, four justices would affirm the judgment of the court below, and four justices would reverse); Reyes v. Egner, 991 A2d 216, 217 (N.J. 2010) (court was evenly split when three justices would affirm the judgment below and three would reverse); Sharpe v. Pugh, 209 SE2d 456 (N.C. 1974) (court was equally divided when one justice did not participate, three justices would affirm the judgment below, and three justices would reverse); Stubblefield v. Wilson, 102 S 885 (Fla. 1924) (court was equally divided where three justices would affirm the judgment below and three would reverse).

Court of Appeals where judges were equally divided upon one claim of error, but had not considered other claims of error that might equally require reversal of the judgment below).

In this case, six judges of the Court of Appeals were of the opinion that the denial of the motion to suppress should be affirmed, and six were of the opinion that it should not. To be sure, of the latter six judges, four were of the opinion that the denial should be reversed entirely, Rodriguez, 321 Ga. App. at 623-626 (Doyle, P.J., dissenting), one was of the opinion that it should be vacated and remanded for further proceedings on the motion, id. at 627 (Dillard, J., dissenting), and one did not say whether she would reverse or vacate, nor did she say what should happen next in the trial court, only that she dissented from the decision to affirm. But for purposes of the Equal Division clause, differences of opinion in this case about whether the judgment of the trial court should be set aside as "reversed" or instead as "vacated" are not dispositive. See Newman, "Last Words of an Appellate Opinion," 70 Brooklyn L. Rev. 727, 728 (2005) ("If a judgment is to be undone, at least in some respect, there is a difference of opinion among judges as to the circumstances in which 'vacated' or 'reversed' should be used in decretal language."). See also Holton v. Lankford, 189 Ga.

6

506, 512-513 (1) (6 SE2d 304) (1939) ("The judgment of reversal, without more, operated only to vacate the orders and decree as therein stated . . .."). Nor are differences of opinion in this case among the six dissenting judges about what ought to happen next in the trial court dispositive. See Parfait v. Transocean Offshore, Inc., 980 S2d 634, 635-637 (La. 2008) (12-member court of appeals was equally divided where six judges would affirm award of damages, two would reduce the award by an amount certain, one would reduce the award by another amount certain, and three would reverse award entirely). Six judges would have let the judgment of the trial court stand, and six would not. There was an equal division in this case, the Court of Appeals ought not have rendered any decision, and it instead should have immediately transferred the case to this Court.[5] Accordingly, we vacate the decision of the Court of Appeals.

---

[5] We note as well that, when the decision of an appellate court is remitted to the trial court, the decision on appeal must be "respected and carried into full effect in good faith by the court below." OCGA § 5-6-10. Consequently, any appellate decision must be clear at the very least about whether the judgment from which the appeal was taken still stands or instead has been set aside. In this case, six judges at the Court of Appeals were of the opinion that the denial of the motion to suppress should be affirmed, and six other judges were of the opinion that it should be set aside. If their split decision were the last word, the trial judge could not possibly be expected to know whether the motion to suppress still stood denied, and in such circumstances, the trial judge could not reasonably be expected to "carr[y] into full effect in good faith" the decision on appeal. The Equal Division clause keeps a trial judge from being put into such an untenable position.

2. We now consider whether the trial court erred when it denied the motion to suppress.[6] Viewed in the light most favorable to the findings of the trial court, the evidence shows that Rodriguez was driving along Mitchell Road in the City of Norcross late in the afternoon of August 18, 2010. She was accompanied by a female passenger, Ereka Taszeika Williams. Rodriguez and Williams passed by a Norcross police officer, whose patrol car was equipped with an automatic license plate recognition system.[7] The system alerted the officer that Rodriguez was driving a vehicle that was known to have been driven by Enrique Sanchez, who was wanted on an outstanding warrant. Based upon this alert, the officer stopped Rodriguez and Williams. After he stopped them, but before he exited his

---

[6] Because this case should have come to this Court by transfer pursuant to the Equal Division clause, and because we have vacated the decision of the Court of Appeals, we could remand for the Court of Appeals to transfer the case back to this Court. But our issuance of a writ of certiorari to the Court of Appeals was sufficient to put the whole case before this Court, and a remand-with-direction-to-transfer-back is unnecessary. We will go ahead and decide the merits of the appeal, as if it had been properly transferred here in the first place.

[7] According to the record, the automatic license plate recognition system uses a camera mounted on the patrol car to photograph the licenses plates of vehicles passing within 15 feet of the patrol car. The system identifies the license plate numbers of the passing vehicles from the photographs, and it then compares those license plate numbers with a database of license plate numbers associated with stolen vehicles and persons with outstanding warrants. If the system matches a license plate number from a photograph to a license plate number in the database, the system alerts the officer of the match.

8

patrol car and approached their vehicle, the officer checked the registration of their vehicle and learned that it was registered to Rodriguez.

When the officer approached the vehicle, he asked Rodriguez and Williams for identification. Rodriguez produced her driver's license, and Williams produced no identification card, but she gave her name and date of birth to the officer. At that point, the officer explained the reason for the stop, and Rodriguez responded that Sanchez is her son and that he was in prison. The officer noticed that Rodriguez did not look at him as they spoke, and he asked whether there were any weapons or contraband in the car, to which the women quickly and simultaneously responded "no." Both women appeared nervous when they responded to the question about weapons or contraband. The officer also observed an "unusually strong" odor of air freshener from the passenger compartment of the car, which he knew to be frequently associated with attempts to mask the odor of narcotics.

The officer then returned to his patrol car to verify the identities of Rodriguez and Williams and to ascertain whether either had outstanding warrants, and in the course of that verification, the officer determined — approximately four minutes after he had initiated the stop — that Williams was

the subject of an outstanding arrest warrant in Florida. By that time, a second officer had arrived at the scene, and the two officers awaited information about whether Florida desired the extradition of Williams. As they waited, they directed Rodriguez and Williams to exit the car, and the officers spoke with them separately. About ten minutes after the stop was initiated, Rodriguez gave the second officer consent to search her vehicle. The officers searched the vehicle, and in the center console and trunk, they found between four and five ounces of marijuana.

(a) In the Court of Appeals and this Court, Rodriguez has contended that the first officer was without sufficient cause to stop and detain her for any length of time. But Rodriguez not only failed to properly raise this contention in the trial court, she affirmatively conceded in her motion to suppress — and in her amended motion to suppress, filed two days *after* the evidentiary hearing on her motion — that, when the automatic license plate recognition system alerted the officer to her car, "the officer certainly had the right to stop the vehicle to investigate." She said nothing in her motion to suppress to put the State on notice that it would be required to prove the lawfulness of the stop itself, as opposed to the lawfulness of the detention that followed. To the contrary, in her motions, she

10

only complained that the stop had been unlawfully prolonged. As we recently

explained,

> Our statutory law provides a procedure by which an accused may move to suppress evidence that was obtained unlawfully. A motion to suppress must be in writing and state facts showing that the search and seizure were unlawful. In the absence of such a motion, the State has no burden to prove the lawfulness of the manner in which evidence was obtained, and the accused fails to preserve any error with respect to the suppression of the evidence.

Hernandez v. State, 294 Ga. 903, 904 (757 SE2d 109) (2014) (citations and

punctuation omitted). In her written motion and amended motion, Rodriguez

failed to state any facts showing that the stop itself was unlawful, and she instead

conceded that it was lawful.[8] As such, she waived any contention that the officer

was without good cause to stop her for the purpose of briefly investigating the

whereabouts of Sanchez, see id., and we decide nothing about whether the alert

---

[8] In a brief filed with the trial court more than a week after the evidentiary hearing, Rodriguez questioned whether the stop itself was lawful. But even then, she said only that "[i]t is questionable, given the testimony at the hearing, whether the officer even had a legitimate basis for instituting the traffic stop." In her brief, Rodriguez did not actually urge the trial court to suppress any evidence based on the allegedly questionable reasonableness of the stop itself. Moreover, if the State failed at the hearing to prove a lawful basis for the officer to stop Rodriguez in the first place — something about which we decide nothing — it perhaps was only because the State had no notice that Rodriguez disputed the basis for the stop. The State cannot be faulted for failing to prove something that Rodriguez never properly put in issue.

by the automatic license plate recognition system was a reasonable basis for the stop.[9]

(b) Rodriguez argued in the trial court that her detention was unreasonably prolonged. The officer had sufficient reason, she said, to stop her car and ascertain whether Sanchez was in it. Once the officer realized that the car was occupied by two women, the officer still had authority, Rodriguez conceded, to briefly inquire whether the women knew of Sanchez and his whereabouts. But the officer had no reasonable basis, she argued, to ask about the identities of Rodriguez and Williams, to ask about weapons and contraband, to verify their identities, and to check whether they had warrants. The check for warrants, of course, led to the discovery that Williams herself was a fugitive, and Rodriguez never has disputed that an officer has reasonable grounds to detain a person wanted in another jurisdiction for a short time to ascertain whether that

_____

[9] According to the dissent, "we have given police the authority to detain persons who are lawfully operating their vehicles for being associated with persons who have outstanding warrants . . .." We decide nothing, however, about whether the association identified by the automatic license plate recognition system in this case was enough of an association to justify the stop. In any event, we note that the record does not include evidence about the precise parameters of the associative algorithm employed by the system or the reliability of the data that it uses. Again, perhaps that is because the State never had notice that the validity of the stop itself was at issue.

jurisdiction desires the extradition of the wanted person.[10] She argued, however, that Williams was discovered to be a fugitive only after their detention was unreasonably prolonged. We disagree.

To begin, we note that the record — viewed in the light most favorable to the findings and decision of the trial court — shows that the officer discovered the outstanding warrant on Williams within about *four* minutes of the stop itself, a stop that, Rodriguez conceded in the trial court, was lawful.[11] Moreover, Rodriguez acknowledged that her detention for at least a portion of those four-or-

---

[10] Rodriguez does not contend that, even after the officers learned that Williams was wanted and thereby had additional grounds to detain Williams, it was unreasonable to continue to detain Rodriguez. We do not, therefore, decide whether Rodriguez was unreasonably detained after the officers learned that Williams was a fugitive. We note, however, that although the dissent says it was unreasonable to continue to detain Rodriguez at that point, the United States Supreme Court has said that it is not reasonable to "expect a police officer to allow people to come and go freely" from a traffic stop or to "let people move around in ways that could jeopardize [the officer's] safety." Brendlin v. California, 551 U. S. 249, 257-258 (II) (B) (127 SCt 2400, 168 LE2d 132) (2007).

[11] About the time that passed before the officer discovered the outstanding warrant, the officer testified that a second officer arrived around four minutes after the initial stop, and he said that, when the second officer arrived, he explained to the second officer that "Williams [had] an active warrant for her arrest." This testimony certainly suggests that the first officer ascertained the existence of the warrant within about four minutes of the initiation of the stop. To the extent that there is any ambiguity in the record, it does not help Rodriguez, who bears the burden of showing error in the record. Boles v. Lee, 270 Ga. 454, 455 (1) (511 SE2d 177) (1999). Moreover, we note that a video recording of the traffic stop was tendered in evidence at the hearing below, but it does not appear in the record on appeal. We must assume, therefore, that the recording supports the decision of the trial court. See Jones v. State, 292 Ga. 593, 597 (3) (740 SE2d 147) (2013).

13

so minutes — including the time it took the officer to initially approach the stopped car, observe its occupants, and inquire about Sanchez and his whereabouts — was reasonable. The only question presented in this case, therefore, is whether the detention was unreasonably prolonged by the inquiry into the identities of Rodriguez and Williams, the question about weapons or contraband in the car, the verification of their identities, and the check for warrants.

The duration of an investigative detention, of course, must be reasonable. See generally Florida v. Royer, 460 U. S. 491, 500 (II) (103 SCt 1319, 75 LE2d 229) (1983) (plurality op.). Claims that such a detention was unreasonably prolonged are of two sorts. In some cases, a detention is prolonged beyond the conclusion of the investigation that warranted the detention in the first place, and in those cases, the courts generally have concluded that such a prolongation — even a short one — is unreasonable, unless, of course, good cause has appeared in the meantime to justify a continuation of the detention to pursue a different investigation. See Salmeron v. State, 280 Ga. 735, 736-737 (1) (632 SE2d 645) (2006). In other cases, the detention is not prolonged beyond the conclusion of the investigation that originally warranted the detention, but it is claimed that the

14

investigation took too long, perhaps because the officer spent too much time inquiring about matters unrelated to the investigation. In these cases, the courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U. S. 675, 686 (II) (B) (105 SCt 1568, 84 LE2d 605) (1985). As the United States Supreme Court has explained, even when an officer poses inquiries "into matters unrelated to the justification for the traffic stop . . . [they] do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not *measurably* extend the duration of the stop." See Arizona v. Johnson, 555 U. S. 323, 333 (II) (B) (129 SCt 781, 172 LE2d 694) (2009) (emphasis added). In the end, the question is "whether [the detention] was appreciably prolonged," considering "the detention as a whole," and keeping in mind that "the touchstone of our inquiry is reasonableness." United States v. De La Cruz, 703 F3d 1193, 1203 (I) (A) (10th Cir. 2013) (citations and punctuation omitted).

Rodriguez contends that this case presents the first sort of claim, arguing that the investigation of Sanchez necessarily concluded when the officer observed two women in the car, asked about Sanchez, and was told that Sanchez

15

was in prison. At that point, Rodriguez claims, there was nothing more for the officer to do to investigate Sanchez and his whereabouts. But the only information about Sanchez that had been provided to the officer at the time of the stop by the automatic license plate recognition system was his name and date of birth. Although the officer may have assumed from the name that "Enrique Sanchez" likely was a man, names do not always conform to common gender stereotypes, and the officer was not absolutely required to accept immediately that Sanchez was not in the car.[12] See Breiding v. Wells, 800 SW2d 789, 790, n.1 (Mo. App. 1990) (citing J. Cash, "A Boy Named Sue" (Columbia Records 1969)). So, although the officer said that the occupants of the car "appeared to be females," and even if he subjectively thought it unlikely that either was named "Enrique," it was not altogether unreasonable for the officer to inquire about and

[12] We note that the record shows that the officer was alerted that "Enrique Sanchez" was born in 1987, and according to the officer, at least one of the women in the car appeared to be about the same age as "Enrique Sanchez." And although "Enrique" is a name given most commonly to men, the record does not show that it is exclusively given to men. Indeed, according to data compiled and published by the United States Social Security Administration, nearly two percent of the American babies born in 1987 and named "Enrique" were female. See http://www.ssa.gov/oact/babynames/limits.html (visited May 31, 2014). And in any event, naming preferences may change over time, and American naming preferences may not match those in other countries. By the way, the record does not show where Sanchez was born, much less that the officer had such information at the time of his investigation.

verify their identities. And, although the officer testified that he had no particular reason to disbelieve the identifying information provided by Rodriguez and Williams, or the information provided by Rodriguez about Sanchez, the officer likewise was not absolutely required to instantly and unconditionally accept the truth of that information without verification and to ask nothing more. Moreover, the officer had done or said nothing at that point to indicate to the women that his investigation of Sanchez was concluded. The investigation was not, as Rodriguez contends, necessarily at an end when the officer observed two women in the car and was told that Sanchez was in prison, and this is not a prolongation case of the first sort.[13] The question instead is whether the officer extended his investigation too long by inquiring about the identities of the

---

[13] That the officer may have subjectively thought it most likely by that point that the women were not Sanchez, but were themselves wanted or in possession of unlawful contraband — and that the officer may subjectively have been more interested in pursuing an investigation of these things — is not dispositive. As the United States Supreme Court has explained, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and "the constitutional reasonableness of traffic stops [do not] depend[] on the actual motivations of the individual officers involved." Whren v. United States, 517 U. S. 806, 813 (II) (A) (116 SCt 1769, 135 LE2d 89) (1996). Nothing objectively shows that the investigation of Sanchez was at an end before the officer learned that Williams herself was a fugitive. See Johnson, 555 U. S. at 333 (II) (B) ("Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.").

17

women, asking about weapons or contraband, verifying their identities, and checking for warrants.

Given that the detention had been underway for only about four minutes when the officer discovered that Williams was a fugitive, and given that Rodriguez concedes that she was reasonably detained for a portion of those four minutes, the inquiries to which Rodriguez objects prolonged the detention for only a couple of minutes at most. Although the short duration of the prolongation is not dispositive, it is relevant to our inquiry. See, e.g., United States. v. Digiovanni, 650 F3d 498, 509 (II) (4th Cir. 2011) (noting that, "where a delay can be characterized as de minimis under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation" (citations omitted)); United States v. Mason, 628 F3d 123, 132 (III) (4th Cir. 2010) ("The one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern." (Citations omitted)). As the Eleventh Circuit has explained, "the police are not constitutionally required to move at top speed or as fast as possible. . . . [A]t a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so." United

18

States v. Hernandez, 418 F3d 1206, 1212, n.7 (11th Cir. 2005). So long as an officer pursues his investigation with reasonable diligence, the Fourth Amendment is not offended. See Sharpe, 470 U. S. at 686 (II) (B).

Moreover, these additional inquiries to which Rodriguez objects were not altogether unrelated to the investigation of Sanchez and his whereabouts. Ascertaining and verifying the identities of the women in the car were minimally intrusive means of confirming that neither was the "Enrique Sanchez" for whom the officer was looking. Verifying that Rodriguez was, in fact, who she claimed to be would have provided the officer with at least some additional reason to believe that, despite her nervous appearance, Rodriguez was being truthful with him about Sanchez's whereabouts. And taking a couple of minutes to verify identities and check for warrants offered a brief opportunity for the officer "to think about what [he] ha[d] seen and heard" and to consider whether any further investigative steps were warranted before the detention concluded. The additional inquiries were not altogether unrelated to the justification for the traffic stop, and that such inquiries and the subsequent identity verification and warrant check could be accomplished in only a couple of minutes suggests their reasonableness.

Equally important, inquiring about the identities of Rodriguez and Williams, inquiring about weapons in the car, verifying their identities, and checking for warrants are activities reasonably directed toward officer safety. Generally speaking, when an officer lawfully stops and detains an individual for a brief investigation — something that, we note again, Rodriguez conceded in this case — the officer is entitled to take reasonable steps to make the scene safe for his investigation. See United States v. Hensley, 469 U. S. 221, 235 (105 SCt 675, 83 LE2d 604) (1985) ("When the Covington officers stopped Hensley, they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."). As the United States Supreme Court has acknowledged, investigative traffic stops "are especially fraught with danger to police officers." Michigan v. Long, 463 U. S. 1032, 1047 (103 SCt 3469, 77 LE2d 1201) (1983). See also Maryland v. Wilson, 519 U. S. 408, 413 (117 SCt 882, 137 LE2d 41) (1997) ("Regrettably, traffic stops may be dangerous encounters."). Accordingly, the officer may take reasonable steps to ascertain whether the persons with whom he is dealing might be dangerous. See Terry v. Ohio, 392 U. S. 1, 23 (III) (88 SCt 1868, 20 LE2d 889) (1968) (acknowledging legitimate interest of "police officer in taking steps

20

to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him"). To this end, courts throughout the country have held that an officer generally may reasonably inquire about the identities of persons detained at the scene of a traffic stop and take reasonable steps to quickly verify their identities and to check their criminal histories and for warrants. See, e.g., <u>United States v. Fernandez</u>, 600 F3d 56, 62 (1st Cir. 2010) (so long as request does not "measurably extend the duration of the stop," no independent justification is required to ask passenger of lawfully stopped car for identification); <u>United States v. Soriano-Jarquin</u>, 492 F3d 495, 500 (4th Cir. 2007) (explaining that, "[a]ssuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene," including by asking driver and passenger for their identifications); <u>State v. McMichael</u>, 276 Ga. App. 735, 741 (2) (624 SE2d 212) (2005) ("The risks inherent in traffic stops create a strong interest in officer safety that justifies reasonable safety measures that minimally intrude upon the Fourth Amendment privacy expectations of motorists" including "for the officer to request identification . . . and to run a computer check on the driver and the passenger for outstanding warrants.") (citation omitted); <u>State v. Williams</u>, 264

Ga. App. 199, 202-203 (590 SE2d 151) (2003) ("Checking for outstanding warrants or criminal histories on the occupants of a vehicle at a valid traffic stop is justified by concern for officer safety during the stop."). In this case, even though the additional inquiries made by the officer and the subsequent identity verification and warrant check may have added a minute or two to the traffic stop, they were justified for officer safety, as well as for their investigative value. See, e.g., United States v. Purcell, 236 F3d 1274, 1278-1279 (11th Cir. 2001) (noting that "[a] request for criminal histories as a part of a routine computer check is justified for officer safety," and holding that, even if check extended stop for three minutes beyond what was necessary to complete investigation that justified the stop, the extension was reasonable).

The process of inquiring about the identities of Rodriguez and Williams, asking about weapons in the car, verifying their identities, and determining if Rodriguez and Williams were the subjects of outstanding warrants did not unreasonably expand the scope or duration of the stop, was minimally intrusive, was justified by the investigation into the whereabouts of Sanchez, and was a reasonable part of the officer's efforts to ensure his safety. And given that Rodriguez has acknowledged that the stop itself and other parts of the detention

22

were reasonable, the detention as a whole was reasonable in duration. The trial court did not err when it denied Rodriguez's motion to suppress,[14] and the judgment of the trial court is affirmed. This case is remanded to the Court of Appeals with direction that a remittitur issue to the trial court, affirming the judgment of the trial court, and accompanied by our opinion.

Judgment vacated and case remanded with direction. All the Justices concur, except Benham and Hunstein, JJ, who concur in part and dissent in part.

---

[14] Apart from her contention that the stop was unreasonably prolonged before she gave consent to search her car, Rodriguez never has disputed — in the trial court or on appeal — that her consent was voluntary.

S13G1167.  RODRIGUEZ v. THE STATE

BENHAM, Justice, concurring in part[1] and dissenting in part.

I write and dissent as to Division 2 because I respectfully disagree that any detainment of Rodriguez was lawful.  Otherwise, with this ruling, we have given police the authority to detain persons who are lawfully operating their vehicles for being associated with persons who have outstanding warrants,  for failing to make eye contact and for using air freshener in their vehicles, none of which is criminal conduct.[2]

As an initial matter, I agree with Judge Doyle in her dissent that Rodriguez did not waive her right to protest the validity of the initial stop.  It is undisputed that the officer in this case made the stop solely because the license plate recognition system alerted that Enrique Sanchez, DOB August 24, 1987, was a wanted person associated with the vehicle.  The officer made no effort prior to the stop to determine whether the vehicle was registered to Sanchez or whether

---

[1] I concur as to Division 1 of the opinion.

[2] See State v. Thompson, 256 Ga. App. 188 (569 SE2d 254) (2002).

Sanchez was still at-large (i.e., that the alert was valid). A basic search of the Georgia Department of Corrections Offender Query database, which is accessible to the public on the world wide web through any internet connection, shows that a person by the name of Enrique Sanchez, male, YOB 1987, was incarcerated at the Coastal State Prison from April 22, 2010 to November 5, 2010.[3] Thus, the officer could have easily completed his investigation of the Sanchez warrant with a simple search of his computer or a call to dispatch and without exiting his vehicle.

Even if the alert from the license plate recognition system created a reasonable suspicion for the stop, the moment that the officer determined that Sanchez was not inside the vehicle and was in prison was the moment the encounter should have ended. Here, Rodriguez had committed no moving violations, neither woman was observed to be engaging in any unlawful activity, and no contraband was in plain sight. The officer testified that he had no reason to disbelieve Rodriguez's explanation about Sanchez, including her assertion that Sanchez was incarcerated. Again, that explanation was easily verifiable by a

---

[3] The only other Enrique Sanchez in the Department of Corrections database was born in 1965.

search of the Georgia Department of Corrections database. There was a complete absence of reasonable suspicion to conduct any further investigation once it was clear Sanchez was not in the vehicle. "[I]f the officer *continues to detain* the subject after the conclusion of the traffic stop and interrogates him or seeks consent to search without reasonable suspicion of criminal activity, the officer has exceeded the scope of a permissible investigation of the initial traffic stop." State v. Sims, 248 Ga. App. 277, 279 (546 SE2d 47) (2001). For the officer to detain the women for any amount of time to question them further or run Rodriguez's and Williams's information through the GCIC was wholly unrelated to the reason for the investigatory stop (i.e., the outstanding bench warrant for Sanchez) and was, thus, unauthorized. Id.[4] See also Florida v. Royer, 460 U.S. 491, 498 (103 SCt 1319, 75 LE2d 229) (1982) (it is unlawful for police to detain a person "even momentarily without reasonable, objective grounds for doing so"); Nunnally v. State, 310 Ga. App. 183 (2) (713 SE2d 408) (2011). "The

[4]Even if, as the majority contends, the officer knew of Williams's outstanding warrant within four minutes of the stop, there was still no basis to detain Rodriguez because her driver's license was valid. At that point, the officer should have at least allowed Rodriguez to leave. Instead, he decided to continue to question the women along with the other officer who had arrived, making both women exit the vehicle as each officer spoke to each woman separately.

scope of the detention must be carefully tailored to its underlying justification."

Florida v. Royer, 460 U.S. at 500.

We enjoy many freedoms and rights in this country, including, but not limited to, freedom of speech, freedom of assembly, freedom of religion, freedom of the press, the right to a speedy trial by jury, the right to vote, the right to travel, and the freedom from unreasonable searches and seizures. As the United States Supreme Court observed over thirty years ago:

> Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. ...[P]eople are not shorn of all Fourth Amendment protection ...when they step from the sidewalks into their automobiles.

Delaware v. Prouse, 440 U.S. 648, 662-663 (VI) (99 Sct 1391, 59 LE2d 660) (1979). Because I believe the police went well beyond their authority in this case, I would reverse the trial court's denial of Rodriguez's motion to suppress and direct that the motion be granted upon return of the remittitur to the trial court.

I am authorized to state that Justice Hunstein joins me in this partial dissent.

4