**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 6, 2024**

# In the Court of Appeals of Georgia

A24A0492. SNELLINGS v. THE STATE.

DILLARD, Presiding Judge.

In this interlocutory appeal, Corvis Snellings appeals from the trial court's denial of his motion to suppress evidence obtained during a traffic stop, contending the stop was unconstitutionally prolonged and expanded beyond its initial investigatory purpose. We agree and reverse.

When the facts material to a motion to suppress are disputed, it generally is for the trial judge to "resolve those disputes and determine the material facts."[1] As a result, we must generally accept the trial court's findings unless they are clearly

---

[1] *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015) (punctuation omitted).

erroneous.[2] And we are charged with construing the evidentiary record in the "light most favorable to the factual findings and judgment of the trial court."[3] We must also limit our consideration of disputed facts to those expressly found by the trial court.[4] Nevertheless, when reviewing video evidence, we owe no deference to the trial court's findings of fact that are plainly discernable from the video and, thus, undisputed.[5] Finally, a trial court's conclusion that "a traffic stop was [not] unreasonably prolonged may often be a fact-intensive determination, but it is

---

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *See, e.g.*, *Mack v. State*, 296 Ga. 239, 241 (765 SE2d 896) (2014) (explaining that case involved no disputed facts because interrogation was captured on video recordings); *Green v. State*, 275 Ga. 569, 573 (2) n.11 (570 SE2d 207) (2002) ("In reviewing the videotaped exchange, we owe no deference to the trial court's findings of fact, because it was not the subject of testimony requiring the trial court's weighing of credibility or resolving of conflicts in the evidence."); *McNeil v. State*, 362 Ga. App. 85, 85 (866 SE2d 249) (2021) ("An appellate court may, however, consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape." (punctuation omitted)); *State v. Depol*, 336 Ga. App. 191, 191 (784 SE2d 51) (2016) (explaining that "to the extent that the controlling facts are undisputed because they are plainly discernable from the patrol car-mounted video recording, as they are in this case, we review those facts de novo" (punctuation omitted)).

ultimately a holding of constitutional law that we review de novo."[6]

So viewed, the record shows that on November 20, 2022, at 7:25 p.m., a deputy with the Rockdale County Sheriff's Department observed a vehicle driven by Snellings as it traveled along I-20. The deputy noticed Snellings's vehicle because it swerved several times within its lane (touching the fog line), and because Snellings briefly activated his right-turn signal even though there was no exit nearby. In light of all this, the deputy initiated a traffic stop and approached Snellings from the passenger side to investigate potential texting while driving or driving under the influence.

When the deputy made contact with Snellings, he grew increasingly concerned about potential impairment because it took several requests before Snellings complied and produced his proof of insurance. Then, after requesting his driver's license, Snellings handed over a piece of paper that was a DUI driver's permit. The deputy was unfamiliar with such a permit and needed to check to make sure it was valid. And during this encounter, the deputy also detected a strong odor of something he could not identify—perfume or alcohol—due to a recent bout with COVID-19.

And because his personal body radio was dying during the stop, the deputy was forced to go back and forth between his car radio and Snellings's vehicle, including to

---

[6] *State v. Allen*, 298 Ga. 1, 4 (2) (779 SE2d 248) (2015); *accord Weaver v. State*, 357 Ga. App. 488, 488 (851 SE2d 125) (2020).

check the legitimacy of the DUI driver's permit. After verifying Snellings's license and insurance information, the deputy was no longer investigating his failure to maintain lane and told him that he was "not going to go any further with it." Even so, the deputy continued to engage with Snellings, asking questions to see whether he was driving under the influence. The deputy also grew concerned that Snellings might be having a health-related issue that mimicked intoxication. So, the deputy continued questioning Snellings about the prior DUI, his driving on the night in question, whether he had consumed an alcoholic beverage (which he denied), and, eventually, whether he had any health-related issues that could have caused his erratic driving.

Snellings was on the phone with his wife throughout the stop, and immediately after the deputy verified his information and indicated the investigation was over, he told Snellings that he would allow him to leave his car behind and ride home with his wife, who was en route to the scene. Nevertheless, the deputy insisted that Snellings "be honest" with him and admit to having consumed an alcoholic beverage. According to the deputy, he wanted to be sure Snellings was safe to continue driving and told him that he would allow him to drive on his own if he passed a field-sobriety test.

At the point when the deputy suggested field sobriety testing, four minutes had passed since the deputy advised Snellings he was "not going to go any further with [the investigation]," and Snellings had already indicated that he had health-related issues (including high blood pressure). Snellings's response to the suggestion, then, was to refuse and say he felt ill. The deputy asked if Snellings needed medical attention and wished to have an ambulance dispatched. And in response, Snellings—whose wife by had not yet arrived on the scene—said that he would like an ambulance.

The deputy returned to his vehicle and requested that an ambulance be dispatched *and* that the Georgia State Patrol respond to the scene. And right after the deputy requested the ambulance, but just *before* he requested that Georgia State Patrol to respond, Snellings's wife finally arrived.[7] The deputy then walked over to her car and advised that he would let Snellings go home with her if she could "talk some sense into him" and get him to admit that he had been drinking, and that an ambulance and Georgia State Patrol were en route. Snellings's wife arrived approximately seven minutes after the deputy told Snellings he could go home so long as his wife drove him

---

[7] The trial court's finding that Snellings's wife arrived prior to the deputy summoning the ambulance is belied by both the body camera and dash-camera footage. But even if the trial court's factual finding in this regard *were* supported by the record, it would not alter our ultimate conclusion.

and he admitted to drinking.

Thereafter, two Georgia State Patrol troopers arrived several minutes before the ambulance; and upon their arrival, the deputy explained to one of the troopers why he stopped Snellings, that he believed Snellings might have been texting and driving, that there were signs of potential impairment, and that an ambulance was en route. But the deputy who initiated the stop told the trooper he could not definitively say Snellings's concerning driving was caused by alcohol consumption. At that point, a trooper approached the vehicle and began questioning Snellings. And upon approaching and engaging with Snellings, the trooper both smelled the odor of an alcoholic beverage within the vehicle and noticed that Snellings's speech was slurred.

Snellings exited the vehicle at the trooper's request but again refused to undergo field-sobriety testing. The trooper observed that Snellings had bloodshot, watery eyes and smelled of an alcoholic beverage. During a subsequent roadside examination by the responding paramedics, Snellings appeared to deliberately throw himself to the ground and eventually refused to allow the EMTs to check his vital signs; but from the checks that *were* performed, the EMTs deemed him medically clear. Snellings was then arrested for driving under the influence as a less-safe driver.

Later, Snellings filed a motion to suppress evidence collected as a result of the traffic stop. The trial court denied the motion, concluding that the stop was not unreasonably prolonged as Snellings claimed. We granted Snellings's application for interlocutory appeal.

As our Supreme Court has explained, the duration of an investigatory detention must be reasonable.[8] And there are two sorts of claims that a detention has been unreasonably prolonged. In the first type of claim,

> a detention is prolonged beyond the conclusion of the investigation that warranted the detention in the first place, and in those cases, the courts generally have concluded that such a prolongation—even a short one—is unreasonable, unless, of course, good cause has appeared in the meantime to justify a continuation of the detention to pursue a different investigation.[9]

And in the other type of case, the detention is not prolonged beyond the conclusion of the investigation that originally warranted the detention, but it is claimed that "the

---

[8] *See Rodriguez v. State*, 295 Ga. 362, 369 (2) (b) (761 SE2d 19) (2014) ("The duration of an investigative detention, of course, must be reasonable." (punctuation omitted)); *Goode v. State*, 367 Ga. App. 849, 850 (2) (888 SE2d 662) (2023) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." (punctuation omitted)).

[9] *Rodriguez*, 295 Ga. at 369 (2); *accord State v. Jones*, No. A24A0328, 2024 WL 1710905, at *2 (1) (Ga. Ct. App. Apr. 22, 2024); *Allen v. State*, 348 Ga. App. 595, 598 (1) (a) (824 SE2d 50) (2019).

investigation took too long, perhaps because the deputy spent too much time inquiring about matters unrelated to the investigation."[10] In this second type of claim, a court must examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."[11]

Here, Snellings argues that this case falls into the first category—a traffic stop that has been prolonged beyond the conclusion of the investigation that warranted the detention in the first place and, as a result, the trial court erred in denying his motion to suppress evidence on that ground. We agree.

The trial court concluded that the initial and continuing mission of the traffic stop was to determine why Snellings swerved in the roadway and whether he was safe to continue driving and, thus, under the totality of the circumstances, the traffic stop was not unreasonably prolonged. But the officer informed Snellings that his investigation was complete and he would permit Snellings to leave with his wife on the condition that he admit to having driven under the influence of alcohol. And when

---

[10] *Rodriguez*, 295 Ga. at 369 (2); *accord Jones*, No. A24A0328, 2024 WL 1710905, at *2 (1).

[11] *Rodriguez*, 295 Ga. at 369 (2) (punctuation omitted); *accord Jones*, No. A24A0328, 2024 WL 1710905, at *2 (1).

Snellings would not say he had been drinking, the detention continued with the officer asking further questions. Then, even after Snellings's wife arrived, the detention continued because he was questioned by the Georgia State Patrol troopers before the responding EMTs could conduct an examination.[12] But as our Supreme Court has explained, an officer's purpose in "an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning, and "[o]nce the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention."[13]

It is well established that an officer may "continue to detain a driver after the investigation of the traffic violation is complete only if the officer has a reasonable, articulable suspicion that the driver was engaged in *other* illegal activity."[14] And

---

[12] The deputy never explained *why* he called Georgia State Patrol to the scene as backup, but he did testify that when he stopped Snellings, it was already 30 minutes after his shift ended, and he is heard on the body camera footage conveying this information to the troopers. He also told the troopers that he decided not to allow Snellings to leave when he felt that Snellings was being untruthful with him (*i.e.*, not admitting to drinking alcohol).

[13] *Salmeron v. State*, 280 Ga. 735, 736 (1) (632 SE2d 645) (2006); *accord Daniel v. State*, 277 Ga. 840, 841 (1) (597 SE2d 116) (2004), *overruled on other grounds by Salmeron*, 280 Ga. 735, 736 (1) (632 SE2d 645); *Bryant v. State*, 326 Ga. App. 385, 388 (756 SE2d 621) (2014); *State v. Long*, 301 Ga. App. 839, 840 (689 SE2d 369) (2010).

[14] *Weaver v. State*, 357 Ga. App. 488, 491 (851 SE2d 125) (2020) (emphasis supplied); *see Migliore v. State*, 240 Ga. App. 783, 784 (525 SE2d 166) (1999) ("[A]n

reasonable, articulable suspicion

> must be based on more than a subjective, general suspicion or hunch. The detention must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the detention, and the officer must have some basis from which the court can determine that the detention was neither arbitrary nor harassing.[15]

Importantly, whether a given set of facts "rises to the level of reasonable articulable suspicion of criminal activity is a legal question."[16]

Here, the deputy testified at the suppression hearing that he never smelled alcohol on Snellings's breath, on his person, or coming from his vehicle, nor did he observe or note anything about him having slurred speech or bloodshot, watery eyes. And prior to informing Snellings that his investigation had concluded, the deputy—unlike the Georgia State Patrol trooper—never asked Snellings to exit the vehicle so he could better assess Snellings's condition. So, the factors for the deputy's suspicion that Snellings might be driving under the influence were his weaving within

---

officer who questions and detains a suspect for other reasons exceeds the scope of permissible investigation unless he has reasonable suspicion of other criminal activity.").

[15] *McNeil*, 362 Ga. App. at 91 (punctuation omitted).

[16] *Id.* (punctuation omitted).

his lane of travel and his confusion and delay in complying with the deputy's request to provide proof of insurance—both of which also made the deputy concerned Snellings might be having a health-related issue (which is *not* a criminal activity).[17] Indeed, the deputy testified that he "felt like there was something off" that could have been "some sort of intoxication or it could have been medical . . . ." And the deputy testified that he did not permit Snellings to leave with his wife after she arrived because he "thought [the situation] needed more investigating because [the deputy] felt like [Snellings] was misleading [him] on the reasoning." The deputy, then, had merely a general suspicion or hunch that Snellings might be driving under the influence, and the stop was unreasonably prolonged.[18]

---

[17] The deputy testified that Snellings's prior DUI did *not* play a role in forming his opinion.

[18] *See Jones*, No. A24A0328, 2024 WL 1710905, at *3 (1) (agreeing with trial court's conclusion that stop was unreasonably prolonged when "the officer testified that it was his routine practice to wait for backup before conducting a DUI investigation 'for both parties' safety, if anything,'" but the trial court "seemingly rejected this rationale as unreasonable given that the officer spent the time waiting outside his patrol car engaging in small talk with [the driver]"); *cf. Crawford-Thomas v. State*, 266 Ga. App. 606, 608 (597 SE2d 635) (2004) ("In the current case, after the traffic stop ended by the officer handing the warning ticket to [the driver], the officer did not continue to detain and question [the driver] based on mere caprice or a hunch. Rather, he had specific, articulable facts that gave rise to his suspicion that she was under the influence of alcohol. Those facts included her erratic driving—driving through the gore, weaving in and out of her lane of traffic, and speeding; her red and watery eyes; her initial refusal to look toward the officer whenever she spoke; and the

Accordingly, we reverse the trial court's denial of Snellings's motion to suppress.

*Judgment reversed. Brown, J., concurs. Padgett, J., dissents.*

<hr>

smell of alcohol coming from her when she finally did look at him and speak."); *Powers v. State*, 261 Ga. App. 296, 301 (2) (582 SE2d 237) (2003) (holding that Forest Service agent had reasonable suspicion of criminal activity to continue investigative detention after other officer wrote a citation when "the Forest Service agent observed a weapon in the truck, noticed [the driver's] extreme nervousness, detected the odor of alcohol on [the driver], performed an HGN test with [the driver's] permission, determined that [the driver] appeared to be under the influence of drugs, and obtained [the driver's] consent to a search").

A24A0492. SNELLINGS v. THE STATE.

PADGETT, Judge, dissenting.

Because I believe the facts of the case demonstrate that the trial court was correct in denying the motion to suppress, I must respectfully dissent.

Our Supreme Court has noted that a police officer is "not constitutionally required to move at top speed or as fast as possible. . . . At a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so." *Rodriguez*, 295 Ga. at 371 (2) (b) (citation and punctuation omitted). The analysis ultimately must be resolved with a determination of whether the detention, considered under the totality of the circumstances, was constitutionally reasonable. *Rodriguez*, 295 Ga. 370 (2) (b). There is no bright line of

demarcation which dictates how many minutes a traffic stop may continue or which words must be uttered to meet constitutional muster. Instead, the focus must be on whether information learned by the officer during the traffic stop justified continued detention. The "touchstone of our inquiry is reasonableness." Id. (citation omitted).

There is no dispute that the officer had clear probable cause to initiate the traffic stop as depicted in the video recordings. When asked for his insurance paperwork, Snellings did not immediately produce any documentation, resulting in the officer having to ask several additional times before it was produced. The officer testified that Snellings was slurring his words and demonstrated "cognitive confusion" during their interaction surrounding the insurance documentation. Snellings's inability to promptly produce the insurance paperwork and his demeanor throughout that exchange increased the officer's concern about Snellings's potential impairment.

The officer returned to Snellings's vehicle a second time after running a computer check on Snellings's driver's license and insurance. The officer testified that while he did not intend to pursue issuance of a citation for the lane violation, he was concerned that something was "off" with appellant, whether it be the result of intoxication or a medical condition. During the officer's second interaction with

2

Snellings, the officer advised Snellings that the officer had been trained to investigate DUI drivers and the appellant responded by saying, "I am not there." Only then did Snellings admit that he had consumed alcohol that evening.

In response to the officer's suggestion of a field sobriety test, and for the first time during the entire interaction, Snellings indicated that he had health conditions and that he was feeling sick. Snellings asked that an ambulance be called to the scene.

As the majority states, the officer contacted his dispatcher and requested that emergency medical personnel ("EMS") and the Georgia State Patrol ("GSP") respond to the scene, requesting the latter to conduct a more thorough impairment investigation. However, there is one other salient fact that was not addressed in the majority opinion. After requesting that his dispatcher send EMS and GSP personnel to the scene, the officer contacted his dispatcher once again and advised that if EMS arrived prior to GSP arriving, GSP should disregard the call.

GSP troopers responded to the scene prior to EMS personnel arriving and a GSP trooper spoke with Snellings through the car's passenger window. After detecting a strong odor of alcohol emanating from Snellings's car and noting that Snellings's speech was slurred, he got Snellings to exit the vehicle where the trooper noted that Snellings's eyes were watery and bloodshot. Snellings refused to participate

in any field sobriety testing with the trooper, just as he had with the initial officer. As a result of his independent examination, the trooper decided to charge the appellant with driving under the influence.

The majority noted that there were extensive verbal exchanges between Snellings and the officer who initially effectuated the traffic stop. However, much of what Snellings said and the manner in which he spoke during those conversations was largely inaudible on the video recording. Snellings only lowered the car's passenger window a few inches at the time of the traffic stop which rendered much of what Snellings said during the exchanges with officers difficult or impossible to discern from the recording. "[W]here controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." *Edwards v. State*, 357 Ga. App. 396, 397 (850 SE2d 837) (2020) (citation omitted) ; *State v. Loechinger*, 357 Ga. App. 852, 853 (851 SE2d 838) (2020) (citation omitted). See also *Depol*, 336 Ga. App. at 191. However, I find that the video recordings do not provide sufficient undisputed facts — particularly relating to Snellings's manner of speech and alleged cognitive confusion — which would enable us to conduct a de novo review of the evidence. The video is not sufficiently clear to allow us to make findings contrary to the officer's testimony and the findings of the trial court.

Our law is clear that a traffic stop may not be extended beyond the amount of time reasonably necessary for the original mission of the traffic stop to be completed. *Goode v. State*, 367 Ga. App. at 850 (2). However, "good cause [can] appear to justify continuation of the detention to pursue a different investigation." Id. at 851 (citing *Rodriguez*, 295 Ga. at 369 (2)). See also *Hall v. State*, 351 Ga. App. 695, 701 (1) (832 SE2d 669) (2019). "[I]nformation learned during the course of a traffic stop may provide a law enforcement officer 'with reasonable, articulable suspicion to prolong the traffic stop.'" *Baggett v. State*, 367 Ga. App. 851, 858 (888 SE2d 636) (2023) (citation omitted).

In this case, the officer told Snelling that he did not intend to pursue the lane violation charge. However, the officer learned additional information during his interaction with Snelling that justified further investigation. Under the totality of the circumstances, the officer was aware that something was "off" with Snelling's general affect. The officer witnessed Snellings driving in an extremely erratic manner, displaying cognitive confusion, and evidencing slurred speech. During their second interaction, Snellings indicated that he was "not there" when the officer suggested that Snellings might be impaired, conceded that he had consumed alcohol, refused to perform any standardized field sobriety testing to dispel the officer's concerns,

claimed sudden illness, and requested EMS to be summoned to the scene. While the officer may have decided against issuing Snellings a citation for failing to maintain lane, there was adequate evidence presented to suggest that something was wrong with Snellings which was impacting his ability to safely drive and which justified further investigation. The officer's continued questioning was justified and appropriate based upon the facts known to him at that time. When Snellings requested that EMS be called, the officer dutifully fulfilled appellant's request and the stop was not extended beyond the time necessary for their arrival.

The trial court found that the evidence should not be suppressed. While the video evidence does allow for independent verification of several aspects of this traffic stop, those recordings do not tell the whole story. The officer who initiated the traffic stop described facts which are reasonable, articulable suspicions that justified further investigation. These sorts of observations have repeatedly been found to justify further investigation of potential impairment. See *Coghlan v. State*, 319 Ga. App. 551, 553 (737 SE2d 332) (2013) ("Methods of proof to show impairment may include evidence of (i) erratic driving behavior, (ii) refusal to [submit to state-administered chemical testing], and (iii) the officer's own observations (such as smelling alcohol and

6

observing strange behavior) and resulting opinion that the alcohol made it less safe for the defendant to drive.") (citation omitted).

There was sufficient evidence presented to support the trial court's finding that probable cause existed for the initial traffic stop to be extended because the officer who initially performed the stop developed reasonable, articulable suspicion that something was wrong with Snellings which impacted his ability to drive. The stop was not extended beyond the amount of time necessary for EMS to arrive at the scene and assess appellant. Therefore, the stop was not unconstitutionally prolonged. For these reasons, I would affirm the trial court's denial of Snellings's motion to suppress and must respectfully dissent from the majority's opinion.