Phipps, Chief Judge.
After police discovered marijuana in a car that was stopped for lane infractions, Patrick Scott and Dorian Allen, the driver and the passenger, respectively, were indicted for the possession of more than one ounce of marijuana.* [1] Scott and Allen moved to suppress the drug evidence as the fruit of an illegal seizure. The court conducted an evidentiary hearing, then granted their motion. The state appeals. For reasons that follow, we affirm.
The sole witness at the suppression hearing was the patrol officer who initiated the traffic stop. On direct examination, he testified to the following. On September 13, 2012, while stationed in the median of an interstate to monitor traffic, the officer observed a 2012 Nissan Altima vehicle cross from the center lane of travel into “the fast lane.” *412 As the Altima passed the officer’s stationary position, the officer saw the driver “pointing his finger all in the passenger’s face.” Concerned that the driver was distracted, the officer decided to catch up with the Altima. As he did so, the officer saw the Altima “make the same lane infractions again”; the officer also saw that the driver was “still reaching over with his fingers, pointing in the passenger’s face.” The officer initiated the traffic stop.
The officer walked to the Altima and informed the two occupants, appellees Scott and Allen, that they were stopped because of lane infractions. The officer asked them whether they were having an argument. Scott answered no, and stated that he was just talking to Allen. The officer advised Scott that he would be writing him a courtesy warning for the lane infractions. The officer obtained from Scott his driver’s license and obtained from Allen a South Carolina identification card.
The officer perceived that Scott and Allen were nervous. Because of the lane infractions, the officer wanted to “see how [Scott] was on his feet” to “make sure he wasn’t intoxicated.” The officer asked Scott to exit the vehicle; Scott got out of the vehicle and walked to the location designated by the officer. The officer conducted a pat-down search of Scott; after finding no weapon, the officer “engaged in general conversation with [Scott]” while he wrote the courtesy warning.
But after writing the warning, the officer did not thereupon hand it (along with the identifications) to Scott, who was standing beside him. Instead, as the officer testified,
[0]nce I completed the warning I had dispatch check both of their driver’s license [s]. Mr. Allen’s was through South Carolina and Mr. Scott’s was through Georgia. While waiting on returns from GCIC to come back, waiting on dispatch I had asked Mr. Scott for consent to search his vehicle. Mr. Scott wouldn’t deny nor consent to a search.
The officer testified that Scott replied only that “you already got me stopped,” and “[s]o at that time I had Mr. Allen exit the vehicle also and once Mr. Allen exited the vehicle I had them both stand at the front of my patrol car and I retrieved my K-9 partner Kazan out of the rear of my vehicle.” When the officer walked the drug dog around the Altima, the dog showed a positive odor response. The officer put Kazan back into the patrol car, then began searching the Altima. While searching the interior of the vehicle, the officer received the requested GCIC information from dispatch; when the officer’s search reached the trunk of the car, he discovered the marijuana.
*413 An audio-video recording of the traffic stop was played at the suppression hearing.
On cross-examination, the officer provided additional details. He testified that, when talking to Scott and Allen as they sat in the Altima, he had looked at the vehicle’s interior, but had seen neither marijuana nor any drug paraphernalia; and he had not detected the odor of marijuana. The officer stated that, when Scott complied with his directive to step outside the Altima, Scott continued to appear nervous, but showed “no signs of being intoxicated or impaired.” The officer had concluded, “[Scott] wasn’t intoxicated.” Additionally, the officer agreed that “the courtesy warning was completed at that time as we see in the video... when [he] contacted] dispatch”; that “[a]fter [he] completed the warning” he “ran the license[s] at that point”; and that the “written warning was completed prior to [his] running the GCIC to dispatch.”
On motion to suppress the evidence, Scott and Allen argued that the drug evidence was discovered only after the officer had unlawfully expanded the traffic stop. In its order ruling thereon, the court recited that it had considered, inter alia, both the officer’s testimony and the recording. The court set forth the state’s position that the extended detention was authorized by the officer’s need to run a computer check, then found, however, that “the officer did not begin this inquiry until... at the point when the officer had finished writing a warning citation for the traffic offense.” The court also determined that it was the drug dog’s response that provided probable cause to search the vehicle, but ruled that at the time the drug dog had so responded, Scott and Allen were being unlawfully detained — i.e., detained without any articulable suspicion of criminal activity. Citing Weems v. State,[2] 3the trial court granted the suppression motion. In three related claims of error, the state challenges this suppression ruling.[3]
In Miller v. State,[4] the Supreme Court of Georgia reiterated three fundamental principles that must be followed when conducting appellate review of a ruling upon a motion to suppress:
First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be
*414 disturbed by a reviewing court if there is any evidence to support [them]. Second, the trial court’s decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court’s findings and judgment.[5]
Further, the Court instructed, “To properly follow the first principle, [an appellate court] must focus on the facts found by the trial court in its order, as the trial court sits as the trier of fact.”[6]
Here, the trial court explicitly included in its order this pertinent finding: “the officer did not begin this inquiry [the computer check at issue] until . . . the point when the officer had finished writing a warning citation for the traffic offense.” This finding must be accepted, as there was evidence adduced at the hearing that supported it.[7] For instance, as detailed above, the officer unequivocally testified so.[8] Moreover, the audio-video recording of the traffic stop supports the officer’s account. Construed most favorably to the upholding of the trial court’s findings and grant of the suppression motion,[9] the evidence showed that, before initiating the computer check, the officer had concluded the tasks related to the investigation of the lane infractions, including a determination that the driver Scott was not intoxicated. The officer, therefore, lacked articulable suspicion of any drug (or other) crime, as the officer’s perception that Scott and Allen were nervous “did not support a finding of reasonable, articulable suspicion that would have justified prolonging the detention.”[10]
As a general rule, an investigatory stop is not unreasonably prolonged by the time necessary to run a computer check.[11] But it does not necessarily follow that an officer may initiate a computer *415 check after completing the investigation into the basis for the traffic stop.[12] Further, a police officer may check “for outstanding warrants or criminal histories on the occupants of a vehicle at a valid traffic stop” based upon concerns for officer safety “as long as under the circumstances they do not unreasonably prolong the stop.”[13] But “[o]nce the tasks related to the investigation of the traffic violation and processing of the traffic citation have been accomplished, an officer cannot continue to detain an individual without articulable suspicion.”[14]
A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. The officer’s purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention.[15]
Accordingly, the evidence here showed that the officer — having accomplished the tasks related to his investigation into lane infractions[16] and having no reasonable, articulable suspicion of criminal activity aside from the traffic violation—unreasonably prolonged the *416 duration of the traffic stop when he initiated the computer check.[17]
The foregoing, governing principles were recently reinforced by the Supreme Court of Georgia’s decision in Rodriguez v. State,[18] which recited:
In some cases, a detention is prolonged beyond the conclusion of the investigation that warranted the detention in the first place, and in those cases, the courts generally have concluded that such a prolongation — even a short one — is unreasonable, unless, of course, good cause has appeared in the meantime to justify a continuation of the detention to pursue a different investigation.[19]
Construing the evidence in the instant case most favorably to the upholding of the trial court’s findings and judgment, the investigation that warranted the detention in the first place — for lane infractions —- had concluded. And there was no evidence that any “good cause ... appeared in the meantime to justify a continuation of the detention in order to pursue a different investigation”[20] — that began when the computer check at issue was initiated.[21] (No evidence was adduced, and no argument has been made, that the computer check was intended to aid the officer in determining whether lane infractions had occurred.)
Finally, although the ultimate conclusion in Rodriguez was that the drug evidence was admissible, the analysis employed by the Court is illustrative as demonstrating adherence to and application of the above-cited governing principles — the Rodriguez Court considered whether the evidence, when construed most favorably to the upholding of the trial court’s findings and judgment, supported the trial court’s suppression ruling that the computer check was initiated during a lawful detention.[22] In that case, the car driven by Rodriguez, who was accompanied by a passenger, was stopped by police for the purpose of investigating the whereabouts of a man with an outstanding warrant, “Enrique Sanchez.”[23] The police found drugs in Rodriguez’s car, giving rise to the criminal prosecution, during which *417 Rodriguez moved to suppress the drug evidence, but the trial court denied her motion.[24] The question presented by that case was whether the detention was unreasonably prolonged by certain identification inquiries, including a computer check.[25] The Court answered that question in the negative.[26]
In reaching its conclusion, the Rodriguez Court made clear that it was construing the evidence most favorably to support the findings and judgment of the trial court in that case —• the denial of the accused’s suppression motion.[27] Further, the Rodriguez Court explained that the inquiries and computer check at issue did not constitute a different investigation, but were related to the investigation of the basis for the traffic stop:
[T]hese additional inquiries to which Rodriguez objects were not altogether unrelated to the investigation of Sanchez and his whereabouts. Ascertaining and verifying the identities of the women in the car were minimally intrusive means of confirming that neither was the “Enrique Sanchez” for whom the officer was looking. . . . The additional inquiries [and computer check] were not altogether unrelated to the justification for the traffic stop.[28]
The Rodriguez Court — having determined that the inquiries and computer check were not a different investigation, but part of the original investigation (that formed the basis of the stop) into the whereabouts of “Enrique Sanchez” — then cited “officer safety” as an alternative basis for affirming the denial of Rodriguez’s motion to suppress.[29] Indeed, reliance upon “officer safety” presupposes that the officer is engaged in the lawful discharge of his duties.[30]
The evidence in the instant case, when construed most favorably to the upholding of the trial court’s findings and judgment granting the accused’s suppression motion,[31] shows that the officer had concluded his investigation that warranted the detention in the first place; that the computer check initiated thereafter was not related to *418 the investigation of the basis for the stop (lane infractions); and that no good cause had appeared in the meantime to justify a continuation of the detention while the officer pursued a different investigation (that began when the computer check was initiated). The continued detention — even if a short one — beyond the conclusion of the investigation that warranted the traffic stop in the first place was therefore unreasonable. Because the officer was not authorized to initiate a different investigation during that unlawful detention, it cannot be said that he was then engaged in the lawful discharge of his duties; “officer safety,” thus, cannot serve as justification for the computer check or for the unlawful detention. Notably, the officer did not testify, nor did the prosecutor argue before the trial court, that officer safety played any role in the computer check, the prolonged detention, or the search for drugs in the Altima.
Given the foregoing, the state has demonstrated no basis to disturb the order granting Scott’s and Allen’s motion to suppress the drug evidence. When the evidence is viewed most favorably to the upholding of the trial court’s findings and judgment, the trial court was authorized to conclude that the drug evidence was discovered as a result of an unconstitutional seizure.
In concluding otherwise, the dissent states that it is relying solely on the audio-video recording, and—after assessing those facts de novo[32] •— details a series of actions taken by the officer before he completed the written warning, then asserts that the officer initiated the computer check “[w]hile still speaking with Scott about the nature of the warning.” Despite this broad characterization of the officer’s conduct, what the recording specifically shows is the officer volunteering what he had already said to the driver Scott minutes before — that he was issuing a courtesy warning, not a ticket.[33] But more importantly, as the trial court found (and as the officer testified and as the recording shows), at the time the officer initiated the computer check, he had already completed the written warning; rather than giving the completed warning to the driver and allowing Scott and Allen to leave, the officer prolonged the detention by initiating the computer check — which check had nothing to do with the purpose of the stop: to investigate lane infractions. Finally, as the recording confirms, after initiating the computer check, the officer engaged in nothing relating to the investigation of the lane infractions. Indeed, the dissent cites nothing. As Miller cautions: Areview *419 ing court violates a “principle of appellate review by focusing on its own assessment of the facts, rather than the facts set forth by the trial court.”[34]
On numerous occasions the appellate courts of this state have invoked [the fundamental principles of appellate review explained in Miller] to affirm trial court rulings that upheld the validity of seizures. These same principles of law apply equally to trial court rulings that are in favor of the defendant and their application to this trial court’s order . . . demand[s] that the court’s order be affirmed.[35]

Judgment affirmed.

Barnes, P. J., Ellington, P. J., and McFadden, J., concur. Andrews, P. J., Ray and McMillian, JJ., dissent.

 See OCGA § 16-13-30 (prohibiting possession of controlled substances).

 318 Ga. App. 749 (734 SE2d 749) (2012).

 See OCGA § 5-7-1 (a) (4) (allowing the state to appeal “[f]rom an order, decision, or judgment suppressing or excluding evidence illegally seized”).

 288 Ga. 286 (702 SE2d 888) (2010).

 Id. at 286 (1) (citation and footnote omitted).

 Id. at 287 (1) (emphasis in original).

 See id.

 See generally Salmeron v. State, 280 Ga. 735, 737 (1) (632 SE2d 645) (2006) (citing the officer’s unequivocal testimony as support for the trial court’s finding).

 See Miller, supra at 286 (1).

 Nunnally v. State, 310 Ga. App. 183, 187 (2) (713 SE2d 408) (2011); see Bell v. State, 295 Ga. App. 607, 609-610 (2) (672 SE2d 675) (2009) (holding that nervousness, perceived from driver’s refusal to make eye contact with officers, together with driver’s “dry mouth,” did not constitute a particularized and objective basis for officers to suspect that motorist possessed contraband); Payne v. State, 244 Ga. App. 734, 739-743 (4), (5) (536 SE2d 791) (2000) (deputy’s testimony — that the stopped driver, inter alia, was nervous, had “shaking” hands, dropped items from his wallet, would not “look me in the eye,” and was “shuffling around” — showed no particularized and objective basis for suspecting that driver was, or was about to be, engaged in criminal activity; thus, driver’s detention was unlawful).

 Hayes v. State, 292 Ga. App. 724, 729 (2) (b) (665 SE2d 422) (2008).

 Cf. St. Fleur v. State, 296 Ga. App. 849, 851 (1) (676 SE2d 243) (2009) (“In this process [of writing a warning], the officers checked [the driver’s) identity with a dispatcher.”); State v. Williams, 264 Ga. App. 199, 205 (590 SE2d 151) (2003) (“[T]he computer checks run by the officer were diligently pursued during the course of a valid traffic stop.”).

 Matthews v. State, 294 Ga. App. 836, 840 (2) (d) (670 SE2d 520) (2008) (citation and punctuation omitted; emphasis supplied).

 Weems, supra at 752 (1) (citation and punctuation omitted) (finding that “[t]he officer had completed the tasks related to the investigation of the traffic violation of following too closely and had written the courtesy warning,” and, having completed the investigation related to the traffic stop, “to legally expand beyond the original investigation of following too closely and the issuance of the warning, the officer had to show that he had articulable suspicion of other illegal activity”).

 Salmeron, supra at 736 (1) (citation and punctuation omitted).

 See, e.g., Rosas v. State, 276 Ga. App. 513, 517 (1) (c) (624 SE2d 142) (2005) (finding that “[a]n officer who lacks reasonable suspicion of other criminal activity exceeds the scope of a permissible investigation of a traffic offense only if he continues to detain and interrogate the subject, or seeks consent to search, after the conclusion of the traffic stop or after the tasks related to the investigation of the traffic violation have been accomplished”); cf. Young v. State, 310 Ga. App. 270, 273-274 (712 SE2d 652) (2011) (finding that ‘because the officer’s suspicions were piqued by his observations of the truck’s condition, the strong scent of perfume emanating from the cab,” the passenger’s demeanor, and the driver’s response to questioning, the investigating officer was prompted and authorized to request a K-9 unit and to run criminal histories on both the driver and the passenger).

 See Weems, supra (officer had no reason to continue to detain driver, “particularly since he had already written [the driver] a warning citation before he inquired into other criminal activity”).

 295 Ga. 362 (761 SE2d 19) (2014).

 Id. at 369 (2) (b) (citation omitted; emphasis supplied).

 Id. (citation omitted; emphasis supplied).

 See generally footnote 16, supra, and the text it accompanies.

 Accord Salmerón, supra.

 Rodriguez, supra at 366 (2).

 Id. at 362.

 Id. at 369-370 (2) (b).

 Id. at 373 (2) (b).

 Id. at 368 (2) (b).

 Id. at 371-372 (2) (b) (emphasis supplied).

 Id. at 372 (2) (b).

 See id. at 373 (2) (b) (noting principle that “[c]heeking for outstanding warrants or criminal histories on the occupants of a vehicle at a valid traffic stop is justified by concern for the officer safety during the stop”) (emphasis supplied).

 See Miller, supra.

 But see Miller, supra at 286 (1) (clarifying “fundamental principles which must be followed when conducting an appellate review” of suppression rulings).

 See generally footnote 16, supra, and the text it accompanies.

 Miller, supra at 289 (2).

 Id. at 286-287 (1) (citation omitted).