In the Supreme Court of Georgia

Decided:  November 2, 2015

S14G1765.  THE STATE v. ALLEN et al.

NAHMIAS, Justice.

A police officer initiated a traffic stop of the car being driven by appellee Patrick Scott, in which appellee Dorian Allen was a passenger.  About eight minutes into the stop, the officer radioed for a computer records check on both Scott and Allen.  While awaiting the response based on Allen's out-of-state identification card, the officer conducted a free-air dog sniff of the car, and about 11 ½ minutes into the stop, the dog alerted, giving the officer probable cause to continue the detention of Scott and Allen and to search the car.  The search led to the discovery of almost 10 pounds of marijuana in the trunk and the arrest and indictment of Scott and Allen.

They moved to suppress the drug evidence on the ground that the traffic stop was unreasonably and thus unconstitutionally prolonged by the records check on the car's passenger.  The trial court granted the suppression motion. After the Court of Appeals affirmed that ruling in a divided decision, we granted

certiorari, and we now reverse. As explained below, under the precedents of this Court and the United States Supreme Court establishing how the constitutionality of a traffic stop should be reviewed, it is clear in this case that the computer records check on the stopped car's passenger was part of the authorized mission of the traffic stop, and it is also clear that the officer conducted the records check and the stop as a whole with reasonable diligence. Accordingly, the stop was constitutional, and Scott and Allen's motion to suppress should have been denied.

1. (a) When reviewing a trial court's ruling on a motion to suppress, "an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." Hughes v. State, 296 Ga. 744, 746 (770 SE2d 636) (2015). This means that the reviewing court generally must accept the trial court's findings as to disputed facts unless they are clearly erroneous, although the reviewing court may also consider facts that "definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility," such as facts indisputably discernable from a videotape. Id. at 746 & n.5. Viewed in this way, the evidence at the suppression hearing, which consisted of the testimony

of the arresting officer and the video and audio recording of the traffic stop made by his police car's dashboard camera (which also captured some of the radio transmissions made by the officer), shows the following.

On the evening of September 13, 2012, Henry County Police Officer Nicholas Jackson was sitting in his police car with his drug dog and another officer, watching southbound traffic on I-75. Officer Jackson observed a vehicle make an improper lane change and saw that the car's driver had his finger pointed "all in the passenger's face." Based on these observations, the officer surmised that the vehicle's occupants were arguing. Concerned that the driver was distracted, Officer Jackson decided to catch up with the car, and as he did so, he saw the car make additional illegal lane changes and that the driver was still reaching over and pointing in the passenger's face. The officer then initiated a traffic stop of the car, which pulled over onto the shoulder of the highway, where the police car parked behind it.

Officer Jackson approached the stopped car on the passenger side.[1] He

---

[1] The second officer, who was identified by Officer Jackson at the hearing but did not testify, got out of the police car and stood behind Officer Jackson. It appears that this officer remained near the front side of the police car, which is not shown by the dashboard camera recording, for much of the stop. He did not take an active role in the stop, and so we will not mention him further; the trial court and Court of Appeals did not even mention his presence.

told Scott, who was the driver, and Allen, who was in the front passenger's seat, why he had pulled them over, but the two men denied arguing. Officer Jackson asked both men for identification. Scott handed the officer his Georgia driver's license and the car's registration information, and Allen provided his South Carolina identification card but told the officer that his current address was not the one on the card. Officer Jackson then told the men that he was going to issue a warning for the improper lane changes. This all took about 2 ½ minutes.

Officer Jackson had not smelled any marijuana or seen any drugs or drug paraphernalia in the car, but because of the lane infractions, he wanted to make sure Scott was not intoxicated, so he asked Scott to exit the car and walk over to the police car; Scott did not appear impaired. While standing in front of the police car, Officer Jackson conducted a pat-down search of Scott, finding no weapons; the officer then began writing the warning citation as he talked with Scott, explaining the warning and asking where Scott was driving. The officer next walked back to the car, where Allen was still sitting, to ask for his current address and where he and Scott were driving. Then the officer went back to the police car and Scott and resumed writing the citation. This all took about 4 ½ minutes.

4

It took about another minute for Officer Jackson to finish writing the warning; the traffic stop had lasted about eight minutes at this point. The officer then radioed Scott's and Allen's identification information to the police dispatcher to run computer records checks through GCIC and NCIC.[2] Just seconds after Officer Jackson finished relaying the information, the dispatcher reported back that Scott's Georgia license was "crystal clear," but she asked the officer to repeat Allen's information and the ensuing check on Allen's out-of-state identification card took longer. Officer Jackson explained to Scott that he was waiting on the return of Allen's information and asked for consent to search the car. Scott declined. Officer Jackson then asked Allen to step out of the car and join Scott in front of the police car; the officer also asked Allen if he had any weapons, and Allen said he did not. The officer never gave the men back their identification cards or told them they could leave.

About a minute after being denied consent to search, the officer retrieved his dog and began an free-air sniff around the stopped car. Less than a minute later, Officer Jackson put the dog away and informed Scott and Allen that the

---

[2] GCIC is the GBI-run Georgia Crime Information Center, and NCIC is the FBI-run National Crime Information Center.

5

dog had alerted for the presence of drugs, meaning that he had probable cause to search the vehicle. At this point, Scott and Allen had been stopped for about 11 ½ minutes. About three minutes later, while the officer was conducting the search of the car, the dispatcher reported back that Allen's South Carolina identification card was clear. Officer Jackson continued the search, found a box with approximately 9.8 pounds of marijuana in the car's trunk, and arrested Scott and Allen.

(b) After Scott and Allen were indicted for possession of the marijuana, they moved to suppress the drug evidence, arguing that it was found only as a result of their illegal detention. After the suppression hearing, the trial court granted the motion. The court concluded that Scott and Allen were being unlawfully detained at the time the drug dog alerted because "[b]y the time this event occurred, the police investigation of the traffic violation which justified the stop had been concluded, and a warning citation had been issued," and because "[n]o valid law enforcement purpose was served by conducting a computer check of the passenger's identification, and it was unlawful to extend the detention of both Defendants while this was done."

The State took an immediate appeal. See OCGA §§ 5-7-1 (a) (4), 5-7-2

6

(b) (1). The Court of Appeals affirmed the trial court's ruling in a 4-3 decision, with the majority opinion holding that "the officer – having accomplished the tasks related to his investigation into lane infractions and having no reasonable, articulable suspicion of criminal activity aside from the traffic violation – unreasonably prolonged the duration of the traffic stop when he initiated the computer check." State v. Allen, 328 Ga. App. 411, 415-416 (762 SE2d 111) (2014) (footnote omitted). We granted the State's petition for certiorari.

2. A trial court's conclusion that a traffic stop was unreasonably prolonged may often be a fact-intensive determination, but it is ultimately a holding of constitutional law that we review de novo. See Jones v. State, 291 Ga. 35, 36-37 (727 SE2d 456) (2012) ("To the extent [a suppression] issue concerns a mixed question of fact and law, we accept the trial court's findings on disputed facts and witness credibility unless they are clearly erroneous, but independently apply the law to the facts."). We have no quibble with the facts of this case as found by the trial court or as recounted by the Court of Appeals, but those courts erred in applying the established law of traffic stops to those facts.

(a) Scott and Allen do not dispute that their initial seizure by the

7

police – the stop of their vehicle – was lawful based on the lane-change violations that Officer Jackson observed. As the U.S. Supreme Court has explained, however,

> a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

Illinois v. Caballes, 543 U.S. 405, 407 (125 SCt 834, 160 LE2d 842) (2005) (citation omitted). Thus, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop, and attend to related safety concerns." Rodriguez v. United States, 135 SCt 1609, 1614 (191 LE2d 492) (2015) (citation omitted).[3]

A dog sniff of a traffic-stopped vehicle "is not fairly characterized as part of the officer's traffic mission," because it "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" Id. at 1615 (citation omitted).

---

[3] We note that Rodriguez was decided after this case was orally argued in this Court, so the trial court and Court of Appeals did not have the benefit of the clarity that decision brought to the legal analysis at issue.

Consequently, prolonging a traffic stop in order to conduct an open-air dog sniff renders the seizure unlawful, even if that process adds very little time to the stop. See id. at 1616 (rejecting the government's argument that a dog sniff may "incrementally" prolong a stop as long as the overall duration of the stop remains reasonable). The Supreme Court has clearly held, however, that conducting an open-air dog sniff around a vehicle during a traffic stop does not itself violate the Fourth Amendment, and – like other investigation unrelated to the stop – it can be lawfully done so long as it does not lengthen the stop at all. See id. at 1614-1615 (explaining that the Court has "concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention," including questioning unrelated to the mission of the stop and an open-air dog sniff). See also Caballes, 543 U.S. at 409 ("[T]he use of a well-trained narcotics-detection dog – one that 'does not expose noncontraband items that would otherwise remain hidden from public view' – during a lawful traffic stop, generally does not implicate legitimate privacy interests." (citation omitted)); State v. Simmons, 283 Ga. App. 141, 143 (640 SE2d 709) (2006) ("'The use of a drug sniffing dog to conduct a free air search around the exterior of the vehicle during the course of a lawful traffic stop does not implicate the

Fourth Amendment . . . .'" (citation omitted)).

The question in this case, then, is whether the free-air dog sniff that resulted in probable cause to detain Scott and Allen and search inside their car was done while some other task related to the mission of the traffic stop was still being conducted, so that the sniff did not add any time to the stop. It is undisputed that Officer Jackson walked his dog around the car while waiting for the results of the computer check on Allen's identification card, and it is equally undisputed that the officer had finished all other mission-related actions by the time he retrieved his dog. Thus, the constitutionality of the dog sniff in this case turns on whether running a computer records check on Allen – a passenger in the stopped car – was a lawful part of the mission of the traffic stop.[4]

_____

[4] Because Scott and Allen at times have argued that the traffic stop ended at the point Officer Jackson finished writing the warning citation, it is important to distinguish between the time at which the mission of the stop is concluded and the time at which the stop itself is concluded. Although ideally these two times will coincide, that is not always the case. "Normally, the [traffic] stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." Arizona v. Johnson, 555 U.S. 323, 333 (129 SCt 781, 172 LE2d 694) (2009). Accord Rodriguez v. State, 295 Ga. 362, 371 n.13 (761 SE2d 19) (2014). Thus, after the officer returns the occupants' documents and indicates that they are free to leave, any further detention may be viewed as a new seizure that would require separate reasonable and articulable suspicion to be lawful. In this case, however, at the time when Officer Jackson began conducting the open-air sniff with his dog, he still had control of Scott's and Allen's identification cards and he had not told them they were free to go, so the original stop was ongoing and the question is whether it was unreasonably prolonged. See Williams v. State, 329 Ga. App. 650, 653 (766 SE2d 82) (2014) ("[B]ecause the officer had not yet informed Williams that he was free to leave with the rental car or returned the rental agreement, the traffic stop was ongoing at the time the free-air canine search

10

(b)     As the Supreme Court recently explained in <u>Rodriguez</u>, the mission of a traffic stop involves both "address[ing] the traffic violation that warranted the stop, and attend[ing] to related safety concerns." 135 SCt at 1614 (citation omitted).  See also id. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" (citation omitted)).[5]  "Related safety concerns" involve both roadway and officer safety.  The Court explained that ordinary inquiries related to roadway safety are permitted even though they are not directed to the specific reason for the traffic stop:

> Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

Id. at 1615 (citations omitted).  As to officer safety, the Supreme Court similarly explained:

was performed.").

[5]  The dissent asserts that "the mission of the traffic stop itself . . . is the determination of whether a traffic infraction has been committed," and that the "authority for the detention ends when tasks tied to the traffic infraction reasonably should have been completed."  This view of Fourth Amendment law is squarely contradicted by <u>Rodriguez</u>.

11

Unlike a general interest in criminal enforcement, . . . the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers," so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. . . . Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.

Id. at 1616 (citation omitted).[6]

---

[6] The compelling importance of officer safety in the context of traffic stops was described well in a Tenth Circuit case that Rodriguez cites in the quoted passage:

The Supreme Court has found it "too plain for argument" that the government's interest in officer safety is "both legitimate and weighty," given the "inordinate risks confronting an officer as he approaches a person seated in an automobile." Other courts have also recognized that "[l]aw enforcement officials literally risk their lives each time they approach occupied vehicles during the course of investigative traffic stops."

In Maryland v. Wilson the Supreme Court noted that in 1994 alone, 5,762 officers were assaulted and 11 were killed during traffic pursuits and stops. Thirty percent of police shootings occurred when a police officer approached a suspect seated in an automobile, and "'a significant percentage of murders of police officers occurs when the officers are making traffic stops.'" The most recent data reveal that in 1999, 6,048 officers were assaulted during traffic pursuits and stops and 8 were killed. More than 34% of those assaults involved a dangerous weapon such as a gun or knife. Firearms were used to commit 82 of the 94 killings of law enforcement officers during traffic pursuits and stops during the 1990s.

The terrifying truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle. The officer typically has to leave his vehicle, thereby exposing himself to potential assault by the motorist. The officer approaches the vehicle not knowing who the motorist is or what the motorist's intentions might be. It is precisely during such an exposed stop that the courts have been willing to give the officers "wide latitude" to discern the threat the motorist may pose to officer safety.

An officer in today's reality has an objective, reasonable basis to fear for his or her

The Court cited two of its traffic-stop cases upholding officer safety measures, one involving the driver and the other the passengers in the stopped car:

> In [Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.E.2d 331 (1977) (per curiam)], we reasoned that the government's 'legitimate and weighty' interest in officer safety outweighs the 'de minimis' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. 434 U.S., at 110-111, 98 S.Ct. 330. See also Maryland v. Wilson, 519 U.S. 408, 413-415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (passengers may be required to exit vehicle stopped for traffic violation).

Rodriguez, 135 SCt at 1615. Thus, a marginally burdensome inquiry that promotes the officer's safe completion of the traffic-stop mission, and is not

---

life every time a motorist is stopped. Every traffic stop, after all, is a confrontation. The motorist must suspend his or her plans and anticipates receiving a fine and perhaps even a jail term. That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current criminal activity that may be discovered during the course of the stop. Resort to a loaded weapon is an increasingly plausible option for many such motorists to escape those consequences, and the officer, when stopping a car on a routine traffic stop, never knows in advance which motorists have that option by virtue of possession of a loaded weapon in the car. In balancing the interests in this case, we are guided by other situations in which federal courts have allowed considerations of officer safety to outweigh fairly intrusive conduct during a traffic stop. Thus, during a routine traffic stop, an officer may order the driver and passengers out of the vehicle; order the passengers to remain in the vehicle; open the door of a vehicle with darkly tinted windows to check for weapons; order the occupants to raise their hands during the stop; and use a flashlight to check the dark interior of a car.

United States v. Holt, 264 F3d 1215, 1222-1223 (10th Cir. 2001) (en banc) (citations omitted), abrogated on other grounds as recognized in United States v. Stewart, 473 F3d1265, 1269 (10th Cir. 2007).

13

done merely to facilitate a detour into some non-mission related task, is a permissible part of the traffic stop. See id. at 1616 (noting that "[o]n-scene investigation into other crimes . . . detours from [the stop's] mission. So too do safety precautions taken in order to facilitate such detours." (citation omitted)).

      (c)    Scott and Allen do not take issue with any of the things that Officer Jackson did during the traffic stop up to the point that he requested a computer records check on Allen, the passenger in the stopped car. On the facts of this case, it is clear that the records check on Allen was not related to determining whether to issue a traffic ticket to the driver of the car (Scott); nor is there evidence that the officer believed that Allen had committed a traffic violation himself; nor was the check needed to ensure roadway safety, since this was not a situation where the passenger would be driving the car away from the stop. But it certainly enhances an officer's safety during a traffic stop to know if anyone in the stopped car – driver or passenger – may pose a particular threat due to an outstanding arrest warrant or a criminal record showing violent offenses. So we will focus on whether conducting a computer records check on the identification provided by a passenger in a car stopped for a traffic violation is an officer safety measure that is ordinarily permitted as part of the mission of

14

a traffic stop.

To begin with, neither asking the detained passenger for identification nor running a computer records check on a person is an act that itself infringes on Fourth Amendment rights:

> The police may ask people who have legitimately been stopped [as part of a traffic stop] for identification without conducting a Fourth Amendment search or seizure. See Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt County, 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."). . . . People do not have a reasonable expectation of privacy in their driver's license or state ID card (or the identification numbers contained by those documents) once they hand them over to the police officers who legitimately asked for them.

United States v. Diaz-Castaneda, 494 F3d 1146, 1152-1153 (9th Cir. 2007). See also United States v. Fernandez, 600 F3d 56, 62-63 (1st Cir. 2010) (concluding that the officer conducting a traffic stop did not need independent justification to ask the passenger for identification).[7]

---

[7] Because Allen has not alleged that he gave Officer Jackson his identification information involuntarily, we need not decide whether the officer was permitted to take any action to determine Allen's identity beyond asking him to voluntarily provide it. See People v. Harris, 886 NE2d 947, 964 (Ill. 2008) ("[A] request for identification is facially innocuous . . . . An innocent passenger has

15

Asking a passenger for identification and then running a computer records check on the identity provided also is unlike a dog sniff because it is squarely related to an officer's safety while completing the mission of the traffic stop. In allowing police officers, as a safety measure, to require passengers as well as drivers to get out of a stopped car, the Supreme Court explained, "[w]hile there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal." Maryland v. Wilson, 519 U.S. at 414-415. Similarly, while checking a passenger's identification may not always serve the combined roadway safety and officer safety objectives of checking the driver's identification, which is clearly permissible, see Rodriguez, 135 SCt at 1614-1615, it is a minimal additional intrusion that serves the weighty interest in officer safety. Indeed, many people would find providing their identification to a police officer for a

nothing to fear and no reason to feel intimidated or threatened. He might even ask why the police officer needs the information. If the officer explains that he may let the passenger drive the vehicle, he may choose the option or decline. If he declines, the officer may not insist that he comply."). See also INS v. Delgado, 466 U.S. 210, 216-217 (104 SCt 1758, 80 LE2d 247) (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. . . . Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person[] refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.").

16

computer records check far less intrusive than being ordered out of the car to stand on the shoulder of a busy highway or on the side of a street in their neighborhood. See United States v. Soriano-Jarquin, 492 F3d 495, 500 (4th Cir.2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification." (citation omitted)).

Although the U.S. Supreme Court has not directly addressed whether checking a passenger's identification is permissible as an ordinary incident of a traffic stop, the Court in Rodriguez treated a passenger identification check as an entirely unexceptional part of the traffic stop at issue. The Court set forth the relevant facts of the traffic stop in that case as follows:

> [Officer] Struble approached the Mountaineer [he had stopped] on the passenger's side. After Rodriguez [the driver] identified himself, Struble asked him why he had driven onto the shoulder. Rodriguez replied that he had swerved to avoid a pothole. Struble then gathered Rodriguez's license, registration, and proof of insurance, and asked Rodriguez to accompany him to the patrol car. Rodriguez asked if he was required to do so, and Struble answered that he was not. Rodriguez decided to wait in his own vehicle.
>
> After running a records check on Rodriguez, Struble returned to the Mountaineer. *Struble asked passenger Pollman for his driver's*

17

*license* and began to question him about where the two men were coming from and where they were going. Pollman replied that they had traveled to Omaha, Nebraska, to look at a Ford Mustang that was for sale and that they were returning to Norfolk, Nebraska. *Struble returned again to his patrol car, where he completed a records check on Pollman,* and called for a second officer. Struble then began writing a warning ticket for Rodriguez for driving on the shoulder of the road.

Struble returned to Rodriguez's vehicle a third time to issue the written warning. By 12:27 or 12:28 a.m. [which was 21 to 22 minutes after the stop began], Struble had finished explaining the warning to Rodriguez, and had given back to Rodriguez and Pollman the documents obtained from them.

Rodriguez, 135 SCt at 1613 (emphasis added).

In its subsequent legal analysis, the Court expressed no misgivings whatsoever about this portion of the stop, including the time it took to complete the records check on the passenger; the Court's concern was the seven or eight minutes added to the stop by the open-air dog sniff of the vehicle, because "the Government's endeavor to detect crime in general or drug trafficking in particular" is not a component of the mission of a traffic stop – unlike "[h]ighway and officer safety." Id. at 1616. See also id. at 1624 (Alito, J., dissenting) (noting that Officer Struble's calling in the information needed to do a records check on the passenger was "a step that the Court recognizes was properly part

18

of the traffic stop"). Because Officer Strubble was clearly diverting from other mission-related activities at the time he conducted the records check on the passenger, if conducting such a check were not related to the mission of a traffic stop, doing so would have rendered the stop illegal, as it clearly prolonged the stop by some amount of time. As discussed before, activities unrelated to the mission of the stop must not extend the time of the stop at all, and such a prolongation of the stop is not permissible even if those activities are done in the middle of the stop. See Rodriguez, 135 SCt at 1616. See also People v. Pulling, 34 NE3d 1198, 1201 (Ill. App. 2015) (holding that an officer unconstitutionally prolonged a stop when he "interrupted his traffic citation preparation to conduct a free-air sniff based on an unparticularized suspicion of criminal activity").

This Court has spoken to the point more directly, holding squarely that identification checks of both drivers and passengers are generally permitted as an officer safety measure during a traffic stop. In our own recent Rodriguez case – Rodriguez v. State, 295 Ga. 361 (761 SE2d 19) (2014) – we explained:

> Equally important, *inquiring about the identities of [driver] Rodriguez and [passenger] Williams, inquiring about weapons in the car, verifying their identities, and checking for warrants are activities reasonably directed toward officer safety.* Generally speaking, when an officer lawfully stops and detains an individual

19

for a brief investigation, . . . the officer is entitled to take reasonable steps to make the scene safe for his investigation. As the United States Supreme Court has acknowledged, investigative traffic stops "are especially fraught with danger to police officers." Accordingly, the officer may take reasonable steps to ascertain whether the persons with whom he is dealing might be dangerous. *To this end, courts throughout the country have held that an officer generally may reasonably inquire about the identities of persons detained at the scene of a traffic stop and take reasonable steps to quickly verify their identities and to check their criminal histories and for warrants.*

Id. at 372-373 (emphasis added; citations omitted).

This holding was not a new development in Georgia appellate law. Our Court of Appeals had said much the same thing in the two cases we cited in Rodriguez and in other cases. See State v. McMichael, 276 Ga. App. 735, 741 (624 SE2d 212) (2005) ("'It is . . . reasonable for the officer to request identification from a passenger, and to run a computer check on the driver and the passenger for outstanding warrants. The risks inherent in traffic stops create a strong interest in officer safety that justifies reasonable safety measures that minimally intrude upon the Fourth Amendment privacy expectations of motorists.'" (citations omitted)); State v. Williams, 264 Ga. App. 199, 202-203 (590 SE2d 151) (2003) ("Checking for outstanding warrants or criminal histories on the occupants of a vehicle at a valid traffic stop is justified by concern for

20

officer safety during the stop."). See also <u>Matthews v. State</u>, 294 Ga. App. 836, 838 (670 SE2d 520) (2008) ("'A reasonable time [for a traffic stop] includes the time necessary to verify the driver's license, insurance, [and] registration, and to complete any paperwork connected with the citation or written warning. *A reasonable time also includes the time necessary to run a computer check to determine whether there are any outstanding arrest warrants for the driver or the passengers.*'" (emphasis in original; citation omitted)).

And Georgia courts are far from alone in this view of traffic-stop law. See, e.g., <u>Soriano-Jarquin</u>, 492 F3d at 500 ("Assuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene. Just as the officer may ask for the identification of the driver of a lawfully stopped vehicle, so he may request identification of the passengers also lawfully stopped." (citation omitted)); <u>United States v. Rice</u>, 483 F3d 1079, 1084 (10th Cir. 2007) ("While a traffic stop is ongoing . . . an officer has wide discretion to take reasonable precautions to protect his safety. Obvious precautions include running a background check on the driver and removing the occupants from the vehicle. Furthermore, because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for

identification from passengers and run background checks on them as well.");

United States v. Purcell, 236 F3d 1274, 1278 (11th Cir. 2001) (holding, in the context where both the driver's and two passengers' identifications were called in for a check, that "[t]he officer may also prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check").

(d)    Under these precedents, Officer Jackson's computer records check on Allen was an ordinary officer safety measure incident to the mission of the traffic stop, and it therefore could permissibly extend the stop for a reasonable amount of time. Accordingly, the trial court erred as a matter of law in concluding that "[n]o valid law enforcement purpose was served by conducting a computer check of the passenger's identification, and it was unlawful to extend the detention of both [the driver and passenger] while this was done."[8]

---

[8] The trial court also incorrectly concluded that "[t]he passenger was not subject to detention at any time because the driver committed a traffic offense." That holding was clearly inconsistent with authoritative U.S. Supreme Court decisions. See Arizona v. Johnson, 555 U.S. at 333 ("The temporary seizure of driver *and passengers* [that begins when a vehicle is pulled over for investigation of a traffic violation] ordinarily continues, and remains reasonable, for the duration of the stop." (emphasis added; citation omitted)). See also Brendlin v. California, 551 U.S. 249, 258 (127 SCt 2400, 168 LE2d 132) (2007) (explaining that a traffic stop effects a seizure of the vehicle's passengers because they would expect that the officer "will not let people move around in ways that

The Court of Appeals majority opinion got closer to the correct constitutional analysis by acknowledging that, "[a]s a general rule, an investigatory stop is not unreasonably prolonged by the time necessary to run a computer check," and that an officer may run checks on "'the occupants of a vehicle at a valid traffic stop' based on concerns for officer safety." Allen, 328 Ga. App. at 414-415 (citation omitted). But rather than recognizing that such checks are a permissible *part* of the traffic stop's mission, the majority erroneously held that such checks unreasonably prolong the stop if they are done "'[o]nce the tasks related to the investigation of the traffic violation and processing of the traffic citation have been accomplished.'" Id. at 415 (citing Weems v. State, 318 Ga. App. 749, 752 (734 SE2d 749) (2012)).

The sequence of the officer's actions during a traffic stop is not determinative; instead, the primary question is whether the activity at issue was related to the mission of the stop. If it is not, like a dog sniff, it can be done only concurrently with a mission-related activity, or it will unlawfully add time to the stop. If, on the other hand, the task is a component of the traffic-stop mission, it may be done at any point during the stop. It does not matter if a mission-

could jeopardize his safety").

23

related activity takes place as soon as the stop begins or, as is the case here, after other mission-related activities have been completed. In Rodriguez, the Supreme Court rejected the proposition that the constitutional analysis depends on the order in which the officers complete their actions. See 135 SCt at 1616 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . , but whether conducting the sniff 'prolongs' – i.e., adds time to – 'the stop.'"). See also United States v. Brigham, 382 F3d 500, 511 (5th Cir. 2004) ("Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means.").[9]

The Court of Appeals majority made a second misstep in noting the absence of testimony from Officer Jackson that "officer safety played any role

---

[9] We do note the possibility that, given other facts, an officer's completion of all other mission-related actions (including, for example, checking and returning the driver's identification) before deciding to check the passenger's identification might be evidence of a lack of diligence in completing the mission of the traffic stop. See United States v. Boyce, 351 F3d 1102, 1105, 1107 (11th Cir. 2003) (concluding that the criminal records check was not part of the original traffic stop investigation because the officer waited at least six minutes after completing the warning and handing the driver back his license and rental agreement before running the check). In this case, however, the record does not support a finding that Officer Jackson was not diligent, and the trial court did not make such a finding.

in the computer check." Allen, 328 Ga. at 418. The circumstances in which officer safety measures like records checks may be employed are not limited to situations where the officer involved later articulates a subjective fear for his safety. "It makes no sense to say that [the officer's] belief that he possessed such [an officer safety] justification, if incorrect, would make an otherwise permissible inquiry unlawful. Indeed, the Supreme Court has repeatedly held that '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" Fernandez, 600 F3d at 62 (quoting Whren v. United States, 517 U.S. 806, 813 (116 SCt 1769, 135 LE2d 89) (1996)). "An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped." Holt, 264 F3d at 1223. See also footnote 5 above. And a reasonable and ordinary officer safety measure does not cease to be one merely because an officer, when testifying about a traffic stop, does not explicitly label it as such, just as an officer need not testify in each traffic-stop case that he asked for the driver's license or for proof of the vehicle's insurance or registration as a "roadway safety" measure.[10]

---

[10] An officer's explanation may help a court understand why a particular *extra*-ordinary action taken to protect officer safety during a traffic stop should be deemed objectively reasonable. We note that the dissent on one page asserts that "[n]o subjective or objective evidence concerning

25

In sum, because the dog sniff was conducted while Officer Jackson was waiting for the return of the computer records check on Allen's identification, which was an ordinary officer safety measure related to the mission of the traffic stop, the dog sniff did not prolong the stop *at all*.

(e)     That conclusion does not end the analysis, however, because the overall duration of the traffic stop must always be reasonable in light of all of the circumstances.  "Authority for the seizure thus ends when tasks tied to the traffic infraction are – *or reasonably should have been* – completed." Rodriguez, 135 SCt at 1614 (emphasis added).  See also Rodriguez, 295 Ga. at 369 ("The duration of an investigative detention, of course, must be reasonable.").  In determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation." United States v. Sharpe, 470 U.S. 675, 686 (105 SCt 1568, 84 LE2d 605) (1985).  Whether the officer acted with reasonable diligence is gauged "by noting what the officer actually did and how he did it." Rodriguez, 135 SCt at 1616.

---

officer safety was presented at the motion to suppress hearing," but on the next page accepts that Officer Jackson's pat down of Scott and questioning Allen about weapons were steps taken "to resolve any immediate officer safety concerns"(which they obviously were, even though the officer did not testify explicitly that he took those steps "for officer safety reasons").  Under the precedents discussed above, which the dissent simply ignores, Officer Jackson's running a records check on Allen was equally appropriate as an officer safety measure.

26

Thus, while it is generally appropriate for an officer to conduct a records check on passengers as a component of the traffic stop's mission, conducting that task, like conducting all other mission-related tasks, must not "lengthen [the] traffic stop beyond what is reasonable." Purcell, 236 F3d at 1279. For example, a records check that added an hour to a traffic stop because the computer system had crashed would likely be deemed unreasonable. See Fernandez, 600 F3d at 61 (explaining that extending a detention by about 20 minutes solely to run a check of the passenger's license would violate his Fourth Amendment rights). In this case, the records check on Allen's South Carolina identification card had been underway for only about three and a half minutes before the drug dog alerted on the car, providing reasonable suspicion for the ongoing seizure of Scott and Allen (and the result of the check was reported within six or seven minutes). That is not an unreasonable time to obtain a records check on a passenger's out-of-state identification document. See Purcell, 236 F3d at 1279 (holding that a three-minute criminal records check did not unreasonably lengthen the traffic stop).

Furthermore, the record shows that Officer Jackson completed *all* of the mission-related steps of the traffic stop in a reasonably diligent manner. The

27

entire initial seizure – from the vehicle stopping to the dog alerting – took about 11 ½ minutes. Whether the duration of a traffic stop was reasonable is often a highly fact-specific inquiry, but ultimately it is a question of law, and similar stops of this length (and much longer) have routinely been deemed lawful. See, e.g., Rodriguez, 135 SCt at 1613, 1615-1616 (expressing no concern about the 21- or 22-minute stop that preceded the dog sniff at issue); id. at 1618 (Thomas, J., dissenting) (stating that a stop of 29 minutes "is hardly out of the ordinary for a traffic stop by a single officer of a vehicle containing multiple occupants" and citing cases upholding traffic stops of about 22 and 30 minutes); Rodriguez, 295 Ga. at 373 (citing with approval Purcell, 236 F3d at 1279, which held that a 14-minute traffic stop was not unreasonably long); Williams, 264 Ga. App. at 202-204 (2003) (holding that a 26-minute stop, including a 17-minute delay to run warrant checks on the driver and passenger, was reasonable); Williams v. State, 233 Ga. App. 70, 71-72 (503 SE2d 234) (1998) (holding that a 35-minute stop was reasonable when the license check on the driver took longer than usual because of his common name).

(f)     For these reasons, the trial court and the Court of Appeals majority erred in concluding that the traffic stop at issue violated Allen's and

28

Scott's Fourth Amendment rights and in ruling that the resulting drug evidence must be suppressed.[11]

Judgment reversed. All the Justices concur, except Benham, Hunstein, and Melton, JJ., who dissent.

---

[11] In ruling that the suppression motion should be granted, the trial court and the Court of Appeals relied heavily on Weems v. State, 318 Ga. App. 749 (734 SE2d 749) (2012), and it is true that the facts in Weems were somewhat similar to the facts in this case. For the reasons discussed in this opinion, we overrule Weems to the extent it held that a free-air dog sniff conducted during a traffic stop while the officer was waiting on the return of computer records checks on driver's licenses provided by the driver and passenger violated the Fourth Amendment.

S14G1765.  THE STATE v. ALLEN et al.

BENHAM, J., dissenting.

I write because I respectfully disagree with the majority opinion.  In this case, it is clear that the officer had effectively completed his traffic investigation prior to deploying his drug dog and, as such, his search of the vehicle was unlawful.

A seizure justified only by a police-observed traffic violation "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation. Rodriguez v. United States, __ U.S. __ (II) (135 SCt 1609, 191 LE2d 492) (2015). The United States Supreme Court has noted that the incidental inquiries accompanying a traffic stop include checking the *driver's* license, any outstanding warrants *against the driver*, the vehicle's registration, and the insurance on the vehicle.  See id.  See also Delaware v. Prouse, 440 U.S. 648, 658–660 (99 SCt 1391, 59 LE2d 660) (1979); 4 W. LaFave, Search and Seizure § 9.3(c), pp. 507–517 (5th ed. 2012). It is undisputed that within ten minutes of the stop, the officer confirmed that Scott, who was the driver, was not intoxicated, decided to issue a written

warning ticket to Scott, finished writing the warning ticket, and received confirmation that Scott had a valid license to operate the vehicle and was not subject to any warrants. While Allen's warrant status was unknown at this point, Allen was a passenger and never purported to have a driver's license and was not operating the vehicle when the violation occurred, and so his status was not critical to the mission of road safety. In fact, the majority opinion concedes that the United States Supreme Court has never affirmatively held that a passenger's status is a required inquiry in any traffic investigation or that such inquiry may prolong the stop after the mission of the traffic stop has been resolved. The case law, rather, suggests that inquiries of passengers are permissible depending on the circumstances surrounding the stop. See, e.g., Arizona v. Johnson, 555 U.S. 323, 333 (II) (B) (129 SCt 781) (2009) (pat down of back seat passenger not unlawful where officer had reason to believe passenger was affiliated with a gang). Indeed, the Supreme Court has stated that "the Fourth Amendment tolerate[s] certain unrelated investigations" only if they do not "lengthen the roadside detention." Rodriguez, supra, __ U.S. at ___ (II).

Here, the majority concedes that "the records check on Allen was not related to determining whether to issue a traffic ticket to the driver of the car

2

(Scott); nor is there evidence the officer believed that Allen had committed a traffic violation himself; nor was the check needed to ensure roadway safety, since this was not a situation where the passenger would be driving away from the stop." Despite this concession, the majority opinion justifies the officer's actions in prolonging the stop as to Allen's identification card, and the deployment of the drug dog while waiting for Allen's information to be returned by the dispatcher, by focusing on case law which highlights the need to support officer safety when conducting traffic investigations.

There is no doubt that officers have difficult jobs and that conducting traffic stops can be dangerous. Officer safety, however, is not a panacea for Fourth Amendment violations. And in this case in particular, the focus on officer safety is irrelevant due to the absence of any evidence that officer safety was ever a concern during this incident. No subjective or objective evidence concerning officer safety was presented at the motion to suppress hearing. The videotape of the encounter shows that the officer conducted a pat down of Scott when he exited the vehicle and determined that Scott was unarmed. This was about four minutes into the stop. On the videotape, you can hear Allen say he has no weapons when the officer asks him to exit the vehicle about ten minutes

3

into the stop.[1]  The video shows that both men, having exited the vehicle, stood by the police car, unrestrained and without incident as the officer then deployed his drug dog and searched the vehicle.

Thus, the officer had taken steps to resolve the traffic investigation *and* any immediate officer safety concerns the two men might pose *prior* to deploying his drug dog.  Any information that could have been revealed from the check of Allen's out-of-state identification card, which was not a driver's license, was unrelated to any legitimate concern the officer had about road safety, resolving the traffic infraction, or his own immediate safety.  Rather, the officer used the inquiry into Allen's information as an excuse to extend the detention beyond the reasonable time it took the officer to investigate the traffic stop and impermissibly detoured his mission into an investigation of criminal activity for which he had no reasonable suspicion or probable cause.[2]  So-called "safety precautions,"such as irrelevant passenger checks, cannot be used to facilitate a detour from the traffic mission into an unlawful investigation as the

---

[1] It cannot be seen on the videotape whether the officer conducted a pat down of Allen for weapons when he exited the vehicle.

[2] Seemingly, the officer was determined to conduct a drug investigation because he only deployed his drug dog when Scott failed to consent to a search of the vehicle ten minutes into the stop.  Up until that point, Scott was standing unrestrained by the police car, Allen was sitting in the stopped vehicle, and the officer had no objective evidence of any criminal activity.

4

stop may "last no longer than is necessary to effectuate [resolution of the traffic infraction]. (Citation omitted.) Rodriguez v. United States, supra, __ U.S. at __ (II). See also United States v. Hight, __ FSupp.3d __, 2015 WL 4239003 (D. Colo. June 29, 2015) (Regardless of officer-safety motivations, traffic stop was unlawful when the stop was measurably extended by officer's decision to wait for additional officers whose presence was designed to facilitate an investigation of defendant for possible drug crime, not to facilitate handling the traffic infraction for which the defendant was stopped); United States v. Evans, 786 F3d 779, 787 (9th Cir. 2015) (Officer safety was not advanced by ex-felon registration check, which took eight minutes, during traffic stop; prolonging stop to conduct ex-felon check and dog sniff was unrelated to traffic mission and violated Fourth Amendment).

Furthermore, the United States Supreme Court has held that a drug sniffing dog has no purpose in an investigation concerning traffic violations. Rodriguez v. United States, supra, __ U.S. at __ (II) ("Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission."). See also State v. Miller, 267 Or. App. 382, 392 (340 P3d 740) (2014) (reasonable suspicion that

defendant was driving under the influence did not support deployment of drug dog which detects the presence of drugs, not whether a person is intoxicated). Likewise, the detection of criminal drug trafficking is unrelated to officer safety. Rodriguez v. United States, supra, __ U.S. at __ (II) ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.") Prolonging the time it reasonably takes to complete a traffic stop in order to conduct an open air sniff by a drug dog is unlawful without exception. Rodriguez v. United States, supra. See also Florida v. Royer, 460 U.S. 491, 498 (103 SCt 1319, 75 LE2d 229) (1982) (it is unlawful for police to detain a person "even momentarily without reasonable, objective grounds for doing so"); Richardson v. State, __ SW3d ___, 2015 WL 4381333 (Tex. App. July 9, 2015) (officer was not permitted to detain the defendant beyond completion of traffic stop to conduct a drug investigation. Traffic stop was complete when officer said he would not be issuing traffic citation); People v. Pulling, 34 NE3d 1198 (Ill. App. 2015) (motion to suppress upheld where officer stopped writing traffic citation in order to conduct free air dog sniff). Compare Illinois v. Caballes, 543 U.S. 405, 407 (125 SCt 834, 160 LE2d 842) (2005) (dog sniff took place simultaneously as the

6

warning was being written and was therefore completed at the same time as the traffic investigation, all within ten minutes).

In sum, the concern over an officer safety check flows from the mission of the traffic stop itself, and the mission is the determination of whether a traffic infraction has been committed. Therefore, the detention must last no longer than necessary to make the determination of whether a traffic violation has occurred, and authority for the detention ends when tasks tied to the traffic infraction reasonably should have been completed. Once the determination of whether a traffic infraction occurred has been completed, the mission is over, the detainees should be immediately released, and the need for safety checks expires concurrently. Checking for safety after the traffic mission has been completed (i.e., by inquiring about the passenger's identity) does nothing to further the goal of ensuring safety *during* the mission; instead, it unreasonably prolongs the stop.

> An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But... he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

> Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." [Caballes, supra, 543 U.S. at 408.] Typically such inquiries involve checking the *driver's* license, determining whether there are

7

outstanding warrants against *the driver*, and inspecting the automobile's registration and proof of insurance.

(Emphasis supplied.) Rodriguez v. United States, supra, __ U.S. at __ (II). Nothing in Rodriguez supports prolonging a traffic stop to inquire into irrelevant passenger information.[3]

Because I believe the officer unlawfully extended the traffic stop in this case, I would uphold the decision of the Court of Appeals affirming the trial court's granting the motions to suppress. Accordingly, I respectfully dissent to the majority opinion. I am authorized to state that Justice Hunstein and Justice Melton join in this dissent.

---

[3]In fact, the Supreme Court has noted that a passenger has a stronger liberty interest than the driver when it comes to a traffic stop investigation. See Maryland v. Wilson, 519 U.S. 408, 413-414 (117 SCt 882, 137 LE2d 41) (1997).