304 Ga. 723
FINAL COPY

S18A1029. MIZELL v. THE STATE.

BOGGS, Justice.

In July 2014, a jury found Willie Mizell guilty of malice murder, felony murder, aggravated assault, and concealing the death of another in connection with the death of Cassandra Bryant.[1] Mizell was sentenced to life imprisonment

---

[1] The crimes occurred on October 8, 2003. On December 30, 2003, Mizell was indicted by a Fulton County grand jury for malice murder, felony murder based on the underlying felony of aggravated assault, aggravated assault, and concealing the death of another. After a jury trial in May 2005, Mizell was found guilty on all counts and sentenced to life for malice murder and ten years for concealing a death, to be served concurrently. His motion for new trial was granted after the trial court found that the State had failed to comply with an order to test potentially exculpatory evidence. The trial court then granted Mizell's motion to dismiss on the same ground, also finding that the State had acted in bad faith. This Court reversed the trial court, finding that the evidence was not constitutionally material. State v. Mizell, 288 Ga. 474 (705 SE2d 154) (2010). Mizell was retried on July 14-17, 2014, again found guilty, and sentenced to life for malice murder plus ten years for concealing a death, to be served consecutively. The trial court stated that the increased sentence was due to the court being made aware of Mizell's extensive and violent criminal record, which was not raised at the previous sentencing, as well as the testimony by the victim's son at the second sentencing. The trial court merged the felony murder and aggravated assault counts into the malice murder count. Mizell filed a motion for new trial on July 22, 2014 and an amended motion for new trial on February 15, 2016. The amended motion for new trial was denied on May 17, 2016, although the trial court amended the sentence to show that the felony murder count was vacated by operation of law. Mizell's notice of appeal was filed on June 10, 2016, and the case was docketed in this Court for the August 2018 term. The case was orally argued on August 7, 2018.

plus ten years. His amended motion for new trial was denied, and he appeals, asserting as his sole enumeration that the trial court erred in denying his motion to suppress. For the reasons stated below, we affirm.

The evidence at trial, viewed in the light most favorable to the jury's verdict, showed that in October 2003, Mizell was renovating units in the Essex Courts Apartments. He lived on the premises, in the rear of Building F. The only other occupant of Building F was the complex's maintenance supervisor, who lived in the front of the building. The supervisor testified that, on October 7, 2003, Mizell worked on a paid job for him off-site. During the work, Mizell told him that he had met a girl, and she was coming over to his house that night. That evening, the supervisor was awakened by a loud noise. About 30 minutes later, someone knocked on his front door, and then on his bedroom window. He got up, pulled the blinds open, and saw Mizell, who was sweating and appeared agitated. Mizell asked for money, but the supervisor replied that he had already paid him, and Mizell left.

On the same evening, the victim told her good friend and roommate that she intended to visit a man named "Willie" at the Essex Courts Apartments. She never returned, but the next morning an apartment resident called the police to

report that she had found a body. It was lying in and partially concealed by a patch of kudzu next to a dumpster behind Building F. Police responded and found a small, partially nude female barely alive and so severely beaten that emergency personnel could not intubate her due to damage to her face and jaw. She died shortly afterwards at Grady Hospital. The medical examiner noted a total of 48 blunt force trauma injuries to the victim's face, head, neck, torso, and extremities, and the cause of death was bleeding around the brain due to blunt force injury of the head and neck. She was also strangled or struck in the neck with sufficient force to fracture her thyroid cartilage. Abrasions on her pelvic area were consistent with being dragged across a hard surface, such as pavement, while unconscious.

As part of their investigation, police checked dumpsters around the crime scene. In a dumpster on the opposite side of the apartment complex from Building F, they found an orange towel. Wrapped inside of it were a red washcloth, a blue washcloth, six Doral cigarette butts, a marijuana cigarette butt, two white tennis shoes — one of which appeared bloodstained — and part of a broken denture. Another detective noticed that Mizell was watching the search and asked Mizell whether he knew the victim or had seen anything unusual.

3

Mizell responded that he had not seen anything unusual or out of the ordinary that night and had no information to give them, other than that he had seen a strange car next to the dumpster the night before. Later the same day, another detective received a call from a resident to return to the scene and meet with Mizell, who said he had some information he wanted to give police. Mizell told the detective that he thought he had handled some possible evidence and had concerns that his fingerprints were on it. He led the detective to the same dumpster where the towel was found and retrieved a plastic bag containing some items of women's clothing, a blue slipper, and a sheet, which appeared to be stained with blood.

When the detective took Mizell to the police station for further questioning, Mizell claimed to have been with his girlfriend for the entire night.[2] After the detective asked Mizell if there was "any reason we should find your fingerprints on the dead lady's body," and eliciting the response, "You shouldn't find mine," the detective staged a radio call ostensibly from the medical examiner, reporting that the examiner had found fingerprints on the victim's

---

[2] The girlfriend initially told police that she was with Mizell all night, but when she gave a formal statement, she stated that she left his apartment around 5:30 p.m. and spent the night at a friend's house.

4

skin. The detective testified that Mizell was "visibly shaken" and "just froze."

Initially, Mizell gave the police permission to search his apartment, but, as they approached his apartment for the search, he became "somewhat belligerent," refused to sign a consent form, and told officers to get a search warrant. The police obtained a warrant the same day, and, in the search of the apartment, discovered a broken portion of a denture, a blue slipper that was the same size and opposite foot of the blue slipper from the dumpster, Doral cigarette butts, and bloodstains on the walls and bed linens. Execution of a second search warrant a few days later recovered pieces of carpet, which reacted to luminol — indicating the presence of blood — and appeared to have been scrubbed. The two fragments of denture "fit like a piece of a puzzle" and, when reassembled, fit "perfectly" into the mouth of the victim, who had missing teeth that corresponded to the denture as well as a deformity of her palate that required an unusual plate design. The blood on the carpet sample was determined to be the victim's, and the cigarette butts contained both the victim's and Mizell's DNA.

Following his arrest, Mizell waived his Miranda rights and was interviewed by police; the video recording of the interview was played for the

jury. Mizell's account of the incident changed significantly. He admitted that the victim was in his apartment, and, while he had first stated that he never touched her, he then said that he helped her stand up. While he had first declared that the victim left his apartment naked, when confronted with the evidence of blood on the sheet, he stated that he wrapped the sheet around her. He then claimed that a man called "Jazmo" was staying at his apartment and had been there in his absence, but a police canvass of the neighborhood with his photograph turned up no one who recognized the man or had seen him in the complex. When police located "Jazmo," he willingly gave a DNA sample and allowed police to take photographs, and his two roommates confirmed that he was at their apartment that night.

1. Although Mizell has not raised the sufficiency of the evidence in his appeal, we hold that the evidence was sufficient to support Mizell's convictions under Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. In his sole enumeration of error, Mizell asserts that the trial court erred in its order of October 14, 2004, denying his motion to suppress the evidence found during the search of his apartment. He contends that the evidence was insufficient to show that he was involved in the crime, and that no "nexus"

6

existed between the crime and his apartment. He cites no law for this contention, citing only case law on preservation of error and the standard of review and a general statement that the home is "the first among equals" under the Fourth Amendment. Florida v. Jardines, 569 U. S. 1, 6 (II) (A) (133 SCt 1409, 185 LE2d 495) (2013).[3]

OCGA § 17-5-21 (a) provides that a search warrant may be issued only upon an affidavit "which states facts sufficient to show probable cause that a crime is being committed or has been committed." This Court summarized the applicable standards in State v. Palmer, 285 Ga. 75, 77-78 (673 SE2d 237) (2009):

> The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair

---

[3] In response to this Court's request at oral argument for case law in support of his contentions, Mizell filed a supplemental brief citing one decision, State v. Staley, 249 Ga. App. 207 (548 SE2d 26) (2001). In Staley, however, the trial court granted the motion to suppress, and the Court of Appeals construed the evidence "in the light most favorable to the trial court's ruling." Id. at 207-208. And, in contrast to the evidence presented here, the officer obtaining the warrant in Staley acknowledged that he had no reason to believe that a crime occurred at Staley's residence, that the victims had ever been there, or that any evidence connected to the crime would be found there or even existed. Id. at 210. Moreover, in Staley, the Court of Appeals quoted this Court's holding in McClain v. State, 267 Ga. 378, 388 (11) (477 SE2d 814) (1996), that "[a]n officer's inference that items sought will be at the place to be searched requires no more than a fair presumption to be reasonable." (Punctuation omitted.) 249 Ga. App. at 209 n.7.

7

probability that contraband or evidence of a crime will be found in a particular place.

The trial court may then examine the issue as a first level of review, guided by the Fourth Amendment's strong preference for searches conducted pursuant to a warrant, and the principle that substantial deference must be accorded a magistrate's decision to issue a search warrant based on a finding of probable cause.

. . .

Our appellate courts will review the search warrant to determine the existence of probable cause using the totality of the circumstances analysis set forth in Illinois v. Gates, 462 U. S. 213 (103 SC[t] 2317, 76 LE2d 527) (1983). The duty of the appellate courts is to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant. The Fourth Amendment requires no more. In reviewing the trial court's grant or denial of a motion to suppress, we apply the well-established principles that the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review, keeping in mind that a magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court.

(Citations and punctuation omitted.) Id.

Mizell relies upon his own version of the facts surrounding the grant of the search warrant for his apartment, ignoring the well-established rule that we must construe the evidence to uphold the magistrate's decision to issue the warrant as well as the trial court's ruling on a motion to suppress and that "the

8

trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous." (Citation and punctuation omitted.) Harris v. State, 298 Ga. 588, 590 (1) (783 SE2d 632) (2016). We have nevertheless reviewed Mizell's contentions with respect to the motion to suppress and find them to be without merit.

In the affidavit accompanying the search warrant application, the detective stated that (1) the victim's nude body was discovered 25 feet from Mizell's apartment; (2) a bloody towel containing bloody sneakers, washcloths, and Doral cigarette butts was found "near the body location"; (3) Mizell, upon being questioned, denied that "anything out of the ordinary had taken place" but later told other residents that he had found bloody women's clothing and disposed of it in a dumpster; (4) police found the clothing, as described, in a black plastic bag; and (5) Mizell, when re-interviewed, admitted to finding the clothing and that he smokes Doral cigarettes.

Applying the deferential standard of review and considering the totality of the circumstances, we find that a substantial basis existed for the magistrate to issue the search warrant. The unclothed body of a severely injured female victim was discovered near Mizell's apartment, as well as bloodstained items and cigarette butts wrapped in a towel. When Mizell belatedly disclosed that he

9

had disposed of bloodstained women's clothing before the discovery of the victim, and that he smoked the brand of cigarettes found wrapped in the bloody towel discovered earlier, that evidence, which was presented to the magistrate, provided a substantial basis for the conclusion that the clothing belonged to the victim, that Mizell had a connection both to the clothing and to the cigarettes, and that his apartment — located a few feet from the victim's body — had a "fair probability" of containing evidence of the crime. "The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men act." (Citation and punctuation omitted.) Glispie v. State, 300 Ga. 128, 133 (2) (793 SE2d 381) (2016). See also Bailey v. State, 301 Ga. 476, 478-479 (II) (801 SE2d 813) (2017) (blood found on entry door handle of defendant's apartment one floor below stabbing victims' apartment, where blood and signs of a struggle were found, established probable cause to search defendant's apartment). "We agree with the trial court, and with the magistrate who issued the warrant. Because there was probable cause to support the search of [Mizell's] apartment, the trial court did not err in denying his motion to suppress." Bailey, supra, 301 Ga. at 479 (II).

Judgment affirmed. All the Justices concur.

Decided December 10, 2018.

Murder. Fulton Superior Court. Before Judge McBurney.

Ryan C. Locke, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, F. McDonald Wakeford, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General, for appellee.