**THIRD DIVISION
DILLARD, P. J.,
GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.gov/rules**

**May 29, 2026**

# In the Court of Appeals of Georgia

A26A0059. MOSS v. THE STATE.

DILLARD, Presiding Judge.

After a trial by jury, Joshua Moss was convicted of a variety of drug and firearm-related offenses. Before trial, Moss moved to suppress evidence collected from a traffic stop, but the trial court denied that motion and later denied a motion for new trial on the same ground. Moss now appeals, solely arguing that the court erred in denying his motion to suppress evidence discovered during an unlawfully prolonged traffic stop. For the following reasons, we affirm.

When we review the denial of a motion to suppress evidence, we must "construe the evidence most favorably to uphold the ruling of the trial court."[1] In doing so, we

---

[1] *Valles v. State*, 357 Ga. App. 167, 167 (850 SE2d 212) (2020) (punctuation omitted). Accord *State v. Allen*, 298 Ga. 1, 2(1)(a) (779 SE2d 248) (2015).

review the court's application of law to undisputed facts *de novo*,[2] and examine "not only the evidence in the record of the hearing on the suppression motion, but also the evidence from the trial."[3] Importantly, when a motion to suppress is heard by the trial judge, that judge sits as "the trier of facts," and the judge's decisions "with regard to questions of fact and credibility must be accepted unless clearly erroneous."[4]

So viewed, the evidence shows that on March 9, 2022, Officer Jeffrey Krueger with the City of Lawrenceville Police Department was observing all activity taking place at 187 Culver Street in Lawrenceville. Krueger had done this for a week or so because the department received an anonymously emailed illegal-drug tip about the home's owner (Katie Wardlaw) and her Jeep. On the date in question, while parked at an abandoned home across the street, Krueger saw a man—later identified as Moss—exit the house at 187 Culver Street, approach the Jeep parked outside, and then approach a Nissan Altima. After approaching the Altima, Moss went back inside the house before

---

[2] *Valles*, 257 Ga. App. at 167 (punctuation omitted). Accord *Mizell v. State*, 304 Ga. 723, 727(2) (822 SE2d 211) (2018).

[3] *Valles*, 257 Ga. App. at 167 (punctuation omitted). See generally *White v. State*, 263 Ga. 94, 98 (5) (428 SE2d 789) (1993) (considering both the transcript of the hearing on appellant's motion to suppress and the trial transcript).

[4] *Valles*, 257 Ga. App. at 167 (punctuation omitted). Accord *Allen*, 298 Ga. at 2(1)(a).

again emerging carrying two bags (one of which was white), and placing them inside the Jeep's engine compartment. The officer believed this activity was drug related.

While the foregoing transpired, Officer Krueger ran the Jeep's tag and the vehicle returned as being owned by Wardlaw. He then contacted the investigator who initially received the drug complaint and was told to leave the area because undercover vehicles were on the way. Krueger then parked at a nearby business, waited until the Jeep began driving, and initiated a traffic stop based on a suspected window-tint violation. The stop was recorded on both his patrol car's dashcam and on his body camera.

After approaching the vehicle and speaking with the occupants, Officer Krueger identified Moss as the driver and Wardlaw as the passenger. He placed his window-tint meter on the windshield and it returned results confirming the tint exceeded the legal limit—allowing only three percent of sunlight to penetrate the windows and making it impossible to see inside the vehicle. Krueger then discussed his findings with Moss and Wardlaw. While doing so, he noticed a wallet on Moss's lap containing a good deal of money.

While Officer Krueger spoke with Moss, a K9 officer—who had been less than a half mile away—responded to the scene. Around this same time, other backup officers

also arrived, and one of them ran both Moss and Wardlaw through the GCIC system. The K9 officer then did a free-air sniff of the vehicle while a backup officer started writing a citation for the window-tint violation. Before conducting the free-air sniff, Moss and Wardlaw were asked to step out of the vehicle for the officers and canine's safety. During the free-air sniff (which was also captured on a body camera), the dog alerted at the front of the vehicle, at the driver's side headlight. At the point the dog alerted, the citation for the window-tint violation was not yet complete.

After the dog alerted during the free-air sniff, officers searched the vehicle and located two bags under the hood—the same bags Officer Krueger had seen Moss place inside the engine compartment. Inside the bags were a 45-caliber handgun and substances the officers suspected were methamphetamine, cocaine, heroine, Xanax, and Deca Steroids, along with a scale. Then, after searching Moss, officers located a good deal of money. The officers also recovered an AR-15 pistol from inside the vehicle.

As a result of the items discovered during the traffic stop, law enforcement obtained a search warrant for Wardlaw's residence. And during the execution of that warrant, officers located other illegal drugs and drug-related paraphernalia. Together, Moss and Wardlaw were indicted on 21 drug and firearm-related counts.

Moss filed two motions to suppress evidence recovered as a result of the traffic stop. In these motions, Moss argued there was no reasonable, articulable suspicion to support the stop and no warrant, consent, or probable cause to then search the vehicle. His second motion challenged the search of both the vehicle and the later search of Wardlaw's residence, arguing there was no consent to search, no extenuating circumstances to justify the lack of a warrant for the vehicle search, and a lack of probable cause for the residence warrant, which he also argued was not properly issued. After a hearing on these motions, the trial court denied both.

In denying Moss's motions as to the search of the vehicle, the trial court found the officer who stopped the vehicle had reasonable, articulable suspicion and "even probable cause" due to the illegal window tint violation. The court also concluded that there was no evidence the stop was prolonged beyond the point necessary to investigate the window-tint violation because the free-air sniff was done while that investigation was ongoing. The court made this finding *sua sponte* even though Moss never argued the stop was prolonged. Then, after trial and conviction, Moss filed a motion for new trial that was later amended to challenge the admission of evidence as a result of the traffic stop, which the court denied. This appeal follows.

Moss's sole contention is that the trial court erred in denying the motion to suppress evidence when the traffic stop was unlawfully prolonged. We disagree.

As the Supreme Court of Georgia has explained,

> a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.[5]

As a result, the tolerable duration of police inquiries in the traffic-stop context is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."[6] This means that after the tasks related to the investigation of the traffic violation and processing of the citation have been accomplished, an officer cannot continue to detain an individual without reasonable

---

[5] *Allen*, 298 Ga. at 4(2)(a) (punctuation omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (125 SCt 834, 160 LE2d 842 (2005)). Accord *Terry v. State*, 358 Ga. App. 195, 200(1) (854 SE2d 366) (2021).

[6] *Terry*, 358 Ga. App. at 200(1) (punctuation omitted). Accord *Allen*, 298 Ga. at 4–5(2)(a).

articulable suspicion.[7] And reasonable, articulable suspicion "requires a particularized and objective basis for suspecting that a citizen is involved in criminal activity."[8]

Importantly, when a free-air sniff is carried out during a traffic stop, it is "not fairly characterized as part of the officer's traffic mission, because it is a measure aimed at detecting evidence of ordinary criminal wrongdoing."[9] So, prolonging a traffic stop to conduct an open-air dog sniff "renders the seizure unlawful, even if that process adds very little time to the stop."[10] To that end, executing an open-air dog sniff around a vehicle *"during* a traffic stop does not itself violate the Fourth Amendment, and—like other investigation unrelated to the stop—it can be lawfully done so long as it does not

---

[7] *Terry*, 358 Ga. App. at 200(1) (punctuation omitted). See *Allen*, 298 Ga. at 6(2)(a) n.4 (explaining that "after the officer returns the occupants' documents and indicates that they are free to leave, any further detention may be viewed as a new seizure that would require separate reasonable and articulable suspicion to be lawful").

[8] *Terry*, 358 Ga. App. at 200(1) (punctuation omitted). See *Hughes v. State*, 269 Ga. 258, 260(1) (497 SE2d 790) (1998) (explaining that to conduct an investigative stop, the detaining officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity" (punctuation omitted)).

[9] *Terry*, 358 Ga. App. at 200(1) (punctuation omitted). Accord *Allen*, 298 Ga. at 5(2)(a).

[10] *Terry*, 358 Ga. App. at 200(1) (punctuation & emphasis omitted). Accord *Allen*, 298 Ga. at 5(2)(a).

lengthen the stop *at all*."[11] And while a trial court's conclusion that a stop was unreasonably prolonged is often a fact-intensive determination, it is ultimately a holding of constitutional law subject to *de novo* review.[12] With all of this in mind, we turn now to the facts relevant to this appeal.

As explained above, upon stopping the Jeep for a suspected window-tint violation, Officer Krueger tested the window tint with his meter around one minute and 24 seconds into the traffic stop. Then, around two minutes and six seconds into the stop, Krueger discussed the window-tint meter results with Moss and Wardlaw. Four minutes and 18 seconds into the traffic stop, a responding backup officer was already running Moss and Wardlaw through the GCIC system, and Krueger was directed to begin writing a citation for the window-tint violation. Krueger then instructed another officer to initiate the citation.

---

[11] *Allen*, 298 Ga. at 5(2)(a) (emphasis supplied). See *Terry*, 358 Ga. App. at 201(1) (explaining that court needed to determine "whether the free-air dog sniff that resulted in probable cause to search inside the car was done while some other task related to the mission of the traffic stop was still being conducted, so that the sniff did not add any time to the stop" (punctuation omitted)).

[12] *Terry*, 358 Ga. App. at 201(1). Accord *Allen*, 298 Ga. at 4(2).

Concurrently with the foregoing, and while Officer Krueger was discussing the window-tint violation with Moss and Wardlaw, a nearby K9 officer reported to the scene. Approximately three minutes after doing so, the K9 officer initiated the free-air sniff of the vehicle, which lasted another few minutes. During this time, the window-tint traffic citation was still being prepared. So, at the time the free-air sniff was carried out, the purpose of the stop was not yet completed.

But this does not end our inquiry. We must also determine whether the free-air sniff prolonged the stop, and we conclude it did not. The evidence shows that because the K9 officer was nearby, he arrived on the scene shortly after it began. And within seven minutes, the K9 officer conducted the free-air sniff, with his dog alerting shortly after that. This occurred while the citation for the window-tint violation was still being prepared, and nothing shows that the free-air sniff delayed or prolonged that process beyond what should have reasonably been necessary.[13] As a result, the trial court

---

[13] See *Allen*, 298 Ga. at 15-16(2)(e) (holding that stop was not prolonged when free-air sniff was conducted while officer awaited the return of computer-records check); *Avant v. State*, 376 Ga. App. 334, 340 (918 SE2d 70) (2025) (holding that overall duration of traffic stop was not unreasonable when "the initial seizure—from the time when the sergeant stopped the rental car until the drug-detection dog indicated the presence of drugs—lasted approximately 11 minutes"); *State v. Dean*, 375 Ga. App. 171, 175 (914 SE2d 541) (2025) (holding that stop was not prolonged when "a second law-enforcement officer arrived while [the stopping officer] was still

correctly denied Moss's motion to suppress evidence and his motion for new trial on this ground.

For these reasons, we affirm the trial court's judgment.

*Judgment affirmed. Gobeil and Pipkin, JJ., concur.*

---

in the process of writing the citation; the second officer took over the task of completing the citation; and while the second officer continued working on the citation, [the stopping officer] conducted the free-air sniff"); *Rush v. State*, 368 Ga. App. 827, 833(2) (890 SE2d 883) (2023) (holding that because "the free-air sniff occurred within five minutes of the initial stop with a K-9 who was already present on the scene and while the officers were still awaiting results from the check on [the appellant's] license, [the appellant] has failed to establish that the free-air sniff unreasonably prolonged the initial detention"); *Jackson v. State*, 335 Ga. App. 630, 632 (782 SE2d 691) (2016) (holding that traffic stop was not prolonged when officer conducted free-air sniff while waiting for the results of a criminal history check); *Lewis v. State*, 332 Ga. App. 466, 470(1) (773 SE2d 423) (2015) (holding that free-air sniff did not unreasonably prolong traffic stop when "it did not hinder the officers' timely completion of the mission of the traffic stop" and "was initiated by one officer while a second officer finished filling out the written warning and while the officers waited for dispatch to return the check on [the] driver's license information"). Cf. *McNeil v. State*, 362 Ga. App. 85, 90 (866 SE2d 249) (2021) (holding that traffic stop was prolonged beyond the time required to issue a warning ticket for following too closely when "the sergeant clearly diverted from the task of issuing a written warning citation and abandoned the traffic investigation to instead pursue further questioning of the driver about her candle business, a matter entirely unrelated to the traffic stop"); *Terry*, 358 Ga. App. at 201(1) (holding that stop was prolonged when "the undisputed evidence show[ed] that all tasks related to the mission of the traffic stop were completed before the free-air dog sniff was conducted").